IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| HARLEYSVILLE PREFERRED INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case No.: 1:20-cv-00340-TFM-B |
| INTERNATIONAL PAPER COMPANY, JRD CONTRACTING & LAND CLEARING, INC., JOHN R. DAILEY SR., and JRD CONTRACTING, INC., | ) ) ) ) ) |
| Defendants. | ) ) |

## DEFENDANT INTERNATIONAL PAPER COMPANY'S MOTION TO TRANSFER VENUE TO THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE

Pursuant to 28 U.S.C. § 1404(a), Defendant International Paper Company ("IP") respectfully requests that the Court transfer venue in this action to the United States District Court for the Western District of Tennessee. Transferring this action is proper pursuant to a forum selection clause that binds IP, Defendant JRD Contracting & Land Clearing, Inc. ("JRD Land Clearing"), and Plaintiff Harleysville Preferred Insurance Company ("Harleysville") to litigate this action under Tennessee law in that court. The contract containing the forum selection clause, which is enforceable against Harleysville and otherwise governs the rights of the parties, is attached hereto as **Exhibit 1** (hereinafter the "Indemnity Contract").

Harleysville has tried to avoid the agreed upon forum for disputes relating to the Indemnity Contract between IP and JRD Land Clearing by improperly joining Defendants John R. Dailey Sr. ("Dailey Sr.") and JRD Contracting, Inc. ("JRD Contracting"). In doing so, Harleysville violated Federal Rule of Civil Procedure 20(a)(2)(A), as Harleysville asserts no right to relief against either

1

of them. Instead, their presence in this action is an artifice designed solely to give the illusion that venue in Alabama would be proper. For this reason, Dailey Sr. and JRD Contracting should be severed and dismissed from this action as misjoined parties.

## I. THE INDEMNITY CONTRACT CONTAINS A CLEAR AND UNAMBIGUOUS FORUM SELECTION CLAUSE.

Pursuant to the Indemnity Contract, JRD Land Clearing is obligated to defend and indemnify IP against any claims arising out of the work done under the Indemnity Contract. **Exhibit 1** at pp. 6-7 (Art. 16.6). That agreement further obligates JRD Land Clearing to list IP as an additional insured under its liability insurance policy, which was written by Harleysville. *Id.* at p. 6 (Art. 16.4). The Indemnity Contract also includes "GOVERNING LAW" and "JURISDICTION" provisions, which read, "This Agreement shall be governed and construed according to the laws of Tennessee without regard to any conflict of law provisions thereof," and "The courts of Tennessee shall have and exclusive jurisdiction over any disputes arising out of or relating to this Agreement," respectively. *Id.* at p. 12 (Arts. 33-34).

These provisions, specifically the forum selection clause, are unambiguous and have been confirmed as such by the Alabama Supreme Court in *Ex parte International Paper Company*, 285 So. 3d 753 (Ala. 2019) (attached hereto as **Exhibit 2**). In that decision, the Alabama Supreme Court, relying on state and federal authorities, interpreted this exact same contract and found the provision in question to be "a validly agreed-upon forum-selection clause" that is "enforceable" against parties and closely-related non-parties. *Id.* at 759, 764. Ultimately, the Alabama Supreme Court ordered the case dismissed  so that it could be re-filed, if at all, in Tennessee. *Id.* at 764-65. The same result, mandating that this action be heard in a Tennessee court under application of Tennessee law, should follow here.

## II. HARLEYSVILLE IS BOUND BY THE FORUM SELECTION CLAUSE IN THE INDEMNITY CONTRACT BETWEEN IP AND JRD LAND CLEARING.

Despite knowing of the Indemnity Contract's forum selection clause directing it to Tennessee, Harleysville filed suit here in Alabama. Harleysville presumably believes that it can avoid a Tennessee forum and application of Tennessee law because it is not a signatory to the Indemnity Contract. If that is indeed Harleysville position, it is incorrect. The law is clear and settled: Harleysville is bound by the Indemnity Contract's forum selection clause because it is a closely related party to that agreement and the underlying dispute between IP and JRD Land Clearing.

In August of 2019, IP made demand on JRD Land Clearing to defend it in an action styled *John R. Dailey Sr. and JRD Contracting, Inc. v. International Paper Company*, Civil Action No. CV-2018-900045.00, pending in the Circuit Court of Wilcox County, Alabama. When JRD Land Clearing failed to honor its commitment, IP filed suit against it in the Western District of Tennessee in a case styled *International Paper Company v. JRD Contracting & Land Clearing, Inc.*, Civil Action No. 2:20-cv-02113. Apparently JRD Land Clearing failed to make a demand upon Harleysville, so IP made a direct demand in March of 2020. Harleysville initially rejected IP's demand. Then, after delaying for months, it filed this action rather than honor its obligation to assume the defense of IP.

The fact that Harleysville is not a signatory to the Indemnity Contract between IP and JRD Land Clearing does not render the forum selection clause unenforceable against it. Under Eleventh Circuit authority, a non-signatory to an agreement is bound to a forum selection clause in that agreement if the non-signatory is "closely related to the dispute such that it becomes foreseeable that it will be bound." *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1299 (11th Cir. 1998) (quoting *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993) (internal quotation

marks omitted). The nature of Harleysville's claims in this action are not just "closely related" to the underlying dispute between IP and JRD Land Clearing that arises out of the Indemnity Contract, they are part of the same dispute. Indeed, Harleysville's claims in this action arise from the Indemnity Contract and the obligations Harleysville undertook through its insurance policy to defend and indemnify IP and JRD Land Clearing for claims connected to the Indemnity Contract. Moreover, the existence of this action is, by itself, proof that Harleysville foresaw that it might be bound by the Indemnity Contract.

In a nearly identical scenario last year, another federal district court, applying the same test, granted the moving party's motion to transfer venue. *See Firemen's Ins. Co. of Wash., D.C. v. ACE Am. Ins. Co.*, 390 F. Supp. 3d 267, 274 (D. Mass. 2019). In *Firemen's*, the court concluded that the "closely related" and foreseeability elements are satisfied whenever an insurer is involved in litigation pertaining to its obligation to defend and indemnify an additional insured that contracted with the insurer's named insured. *Id.* The court reasoned that, in such a scenario, the insurer's request for declaratory relief would, by its very nature, satisfy all of the requirements to bind the insurer to the forum selection clause. The court explained that it is "certainly foreseeable" that an insurer "might have to indemnify [the additional insured]" because of the contract between its named insured and that additional insured. *Id.* And moreover, the insurer would be "closely related" to the "present dispute" because its claims naturally pertain to the insurer's obligations to defend and indemnify as a result of the underlying contract. *Id.* (emphasis added).

As in *Firemen's*, Harleysville's intimate relationship to the Indemnity Contract renders the agreement's forum selection clause and choice of law provision binding in the present action. Harleysville's attempt to avoid the forum selection clause therefore fails, and this Court should transfer the action to Tennessee as the Indemnity Contract requires.

4

### III.   HARLEYSVILLE CANNOT POINT TO ANY OTHER CIRCUMSTANCE THAT WOULD RENDER THE FORUM SELECTION CLAUSE UNENFORCEABLE AGAINST IT.

The Supreme Court and the Eleventh Circuit have repeatedly held that whenever parties memorialize their choice of a specific venue in a binding, written agreement, that decision will be enforced pursuant to § 1404(a). *See Atlantic Marine Constr. Co., Inc. v. United States Dist. Court for the Western Dist. of Texas*, 571 U.S. 49, 63 (2013); *accord P&S Bus. Machs., Inc. v. Canon USA, Inc.*, 331 F.3d 804, 807 (11th Cir. 2003) ("Forum selection clauses in contracts are enforceable in federal courts."); *Stewart Org., Inc. v. Ricoh Corp.*, 810 F.2d 1066, 1070 (11th Cir. 1987) (en banc), *aff'd and remanded on other grounds*, 487 U.S. 22 (1988) (stating that the Eleventh Circuit gives forum selection clauses "a broad interpretation"). A "heavy burden of proof" is placed on any party which seeks to prove the unenforceability of a forum selection clause. *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 (1991).

Although motions to transfer for the convenience of parties and witnesses can involve a multi-factor balancing test, the "calculus changes [as here] when the parties' contract contains a valid forum-selection clause, which 'represents the parties' agreement as to the most proper forum.'" *Atlantic Marine Constr. Co., Inc.*, 571 U.S. at 63 (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 31 (1988)). When parties are bound to a forum selection clause, "the plaintiff's choice of forum merits no weight." *Id.* To the contrary, "as the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Id.*

IP and JRD Land Clearing agreed to a valid forum selection clause in the Indemnity Contract. Harleysville's claims in this action arise out of the Indemnity Contract containing that forum selection clause. Thus, Harleysville is bound to that contractual provision. Furthermore, IP is entitled to enforce Harleysville's duty to defend and indemnify IP and to do so in the venue

specified by the Indemnity Contract. Harleysville's choice of this particular forum "merits no weight," and Harleysville has not identified any other circumstances present that would render transfer to the Western District of Tennessee unwarranted. Ultimately, IP, JRD Land Clearing, and Harleysville are all bound to litigate this dispute in Tennessee under Tennessee law.

## IV.   HARLEYSVILLE VIOLATED FED. R. CIV. P. 20(a)(2)(A) BY JOINING DAILEY SR. AND JRD CONTRACTING.

Dailey Sr. and JRD Contracting are improperly joined parties added for the sole purpose of avoiding the proper venue for this action. Harleysville's complaint does not state any claims pertaining to Defendants John R. Dailey Sr. and JRD Contracting. In its prayer for relief, Harleysville seeks declaratory judgment only with respect to obligations it owes to IP and JRD Land Clearing. The prayer for relief mentions neither Dailey Sr. nor JRD Contracting. Instead, Harleysville only mentions Dailey Sr. and JRD Contracting in explaining their claims against IP in the Wilcox County, Alabama, action.

By joining Dailey Sr. and JRD Contracting as defendants in this action, Harleysville violates the plain language of Federal Rule of Civil Procedure 20(a)(2)(A). Rule 20 states that defendants may be joined if "*any right to relief* is asserted against them." Fed. R. Civ. P. 20(a)(2)(A) (emphasis added). But Harleysville fails to state "any right to relief" against either Dailey Sr. or JRD Contracting. This action revolves around contracts to which neither Dailey Sr. nor JRD Contracting are parties and from which neither Dailey Sr. nor JRD Contracting accumulate any obligations. They are the only parties in this action not bound by the forum selection clause contained in the Indemnity Contract. And uncoincidentally, they are also the only defendants in this action against whom Harleysville asserts no right of relief.

Dismissing or severing Dailey Sr. and JRD Contacting is the proper remedy for Harleysville's misjoinder of parties. The Federal Rules of Civil Procedure permit the court to drop

or sever an improperly joined party *sua sponte*. Fed. R. Civ. P. 21. And the Eleventh Circuit has confirmed that "the proper remedy is for the district court to dismiss those defendants" whom the plaintiff joined in "contravention of [Rule 20(a).]" *Daker v. Head*, 730 Fed. App'x 765, 768 (11th Cir. 2018).

## V.   THIS ACTION SHOULD BE TRANSFERRED TO THE WESTERN DISTRICT OF TENNESSEE.

For the reasons set forth above, IP respectfully requests that this case be transferred to the United States District Court for the Western District of Tennessee for further proceedings and that Dailey Sr. and JRD Contracting be severed or dismissed from this action.


Dated this 23rd day of July, 2020.


Respectfully submitted,



s/ Brian P. Kappel
One of the Attorneys for Defendant
International Paper Company


**OF COUNSEL:**
John M. Johnson (jjohnson@lightfootlaw.com)
Brian P. Kappel (bkappel@lightfootlaw.com)
Charles M. Hearn (chearn@lightfootlaw.com)
LIGHTFOOT, FRANKLIN & WHITE, LLC
The Clark Building
400 20th Street North
Birmingham, AL 35203
(205) 581-0700
(205) 581-0799 (fax)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 23rd day of July, 2020, I filed a true and correct copy of the foregoing with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to the following counsel of record:

William E. Shreve, Jr.
J. Breanne Zarzour
PHELPS DUNBAR, LLP
P.O. Box 2727
Mobile, AL 36652

*Attorneys for Plaintiff Harleysville Preferred Insurance Company*

I further certify that the following entities will be served by United States Mail, postage prepaid and properly addressed:

JRD Contracting & Land Clearing, Inc.
John R. Dailey Sr.
JRD Contracting, Inc.
2100 Camden Bypass
Camden, AL 36726

Respectfully submitted,

s/ Brian P. Kappel
Of Counsel

# EXHIBIT 1

# INTERNATIONAL PAPER COMPANY

## PINE HILL MILL

## WASTE SERVICES AGREEMENT

Contract No. MPWSPH16

**THIS WASTE SERVICES AGREEMENT** ("Agreement") is entered into this **1st day of June, 2016**, by and between **INTERNATIONAL PAPER COMPANY**, with its principal place of business at 6400 Poplar Avenue, Memphis, TN 38197 ("IP") and **JRD CONTRACTING AND LAND CLEARING, INC.**, with offices located at 2100 Camden Bypass, Camden, AL 36726 ("Service Provider").

**WHEREAS**, IP desires to retain Service Provider to provide certain waste handling and disposal services at International Paper Pine Hill Mill, and

**WHEREAS**, Service Provider desires to provide such services (the "Services"),

**NOW, THEREFORE**, IP and Service Provider agree as follows:

**ARTICLE 1. TERM.** Unless terminated pursuant to the terms hereof, this Agreement shall commence on **August 1, 2016** and shall have a term which will expire on **July 31, 2021.**

**ARTICLE 2. SCOPE OF SERVICES.** Service Provider shall perform the services set forth in Exhibit A, Scope of Services, which is attached hereto and is incorporated herein.

**ARTICLE 3. COMPENSATION.** Service Provider shall be compensated for its services as set forth in Exhibit B, Compensation, which is attached hereto and is incorporated herein.

**ARTICLE 4. COSTS TO BE REIMBURSED.** IP shall reimburse Service Provider for all reasonable costs paid directly by Service Provider and incurred in the proper completion of the Services, including the following costs. Rates shall not exceed the standard in the locality of the Services, except with the prior written consent of IP. The labor base rates will remain firm for the duration of the Agreement; all adjustments must be approved and documented by the Global Sourcing Category Manager. Once approved, the Category Manager will forward documentation of the applicable changes to the appropriate contact in IP centralized Accounts Payable to ensure invoice accuracy and payment.

    (a)   Subcontracts paid by Service Provider and approved by IP.

GSC CE Waste Services Agreement - IP Legal 8/15/14      1      Agreement No. MPWSPH16

**Confidential Pursuant to Protective Order**

IP_JRD000515

(b) All work completed on a cost per ton basis will be subject to an annual audit by IP.

**ARTICLE 5. COSTS NOT TO BE REIMBURSED**: Service Provider shall not be reimbursed for any of the following:

(a) Wages of any officers or of any employee in the Service Provider's home office, or any employee not directly employed in performing the Services.

(b) Overhead or general expenses of any kind, except as expressly included in Article 4.

(c) Interest on capital employed either in plant or in expenditures in providing the Services, except as expressly included in Article 4.

(d) Any cost resulting from injury (including death) of any person or from damage to property of any person (including the parties hereto) that is due to the fault or negligence of Service Provider or anyone directly employed by Service Provider, regardless of whether Service Provider recovers such cost through insurance.

(e) Any cost due to the fault or negligence of Service Provider, either for the making good of defective work, disposal of material wrongly supplied, or excess costs of material or labor, or otherwise, regardless of whether Service Provider recovers such cost through insurance.

(f) Any cost incurred by Service Provider under the indemnity and hold harmless provision of Article 16 of this Agreement, regardless of whether Service Provider recovers such cost through insurance.

(g) Demurrage of trucks or equipment will not be incurred by IP.

(h) Premiums on insurance policies required by this Agreement. The cost for these premiums.

(i) Preferential unloading of IP's Contractor trucks, which includes minimal wait time for equipment unloading.

**ARTICLE 6. PAYMENT PROCEDURES.** Payment procedures shall be as follows:

Service Provider shall submit a monthly invoice, accompanied by such supporting documentation as may be reasonably required by IP. IP shall pay each invoice within sixty (60) days of receipt, unless stated otherwise in Exhibit B, Compensation.

In the event that IP disputes a portion of an invoice, IP shall pay the undisputed portion and inform Service Provider of its objections to the remainder of the invoice. The parties

**Confidential Pursuant to Protective Order**

**IP_JRD000516**

shall negotiate in good faith to resolve the dispute. Amounts due the Service Provider after resolution of any such disputes shall be paid in the next payment cycle.

**ARTICLE 7. DISCOUNTS, REBATES, REFUNDS.** All cash or trade discounts, rebates and refunds, and all returns from the sale of any materials that may be surplus shall be for the benefit of IP.

Service Provider acknowledges and agrees that IP may, from time to time issue notice to Service Provider and designate in writing preferred vendors, subcontractors and service providers herein after referred to as "Tier I Suppliers". With respect to the Scope of Work hereunder and to the extent goods and services of Tier I Suppliers are available, Service Provider agrees to purchase required goods and services from Tier I Suppliers as soon as possible after receipt of IP's notice of Tier I Suppliers, but commencing no later than thirty (30) days from receipt of IP's written notice designating approved Tier I Suppliers, and Service Provider agrees to enter IP's corporate account number on all such purchase orders with Tier I Suppliers. Service Provider recognizes that its negligent or willful failure to comply with the provisions of this paragraph will result in the Service Provider incurring costs which are not subject to reimbursement by IP.

**ARTICLE 8. REPRESENTATIONS.** Service Provider represents that:

A.     Service Provider currently possesses all necessary licenses, permits and approvals required by law to execute, deliver and perform its duties under this Agreement, and is qualified to do business where the services are to be performed.

B.     Service Provider is duly organized, validly existing and in good standing under the laws of its domicile and has full power and authority to execute, deliver and perform this Agreement.

C.     This Agreement constitutes a legal, valid and binding Agreement of Service Provider, enforceable against Service Provider in accordance with its terms, except as limited by bankruptcy, insolvency, receivership and similar laws.

D.     Service Provider will comply with all applicable federal, state, and local laws applicable to waste handling. Service Provider acknowledges the hazards associated with the Services.

**ARTICLE 9. CHANGES TO SCOPE OF SERVICES.** The scope of Services shall be subject to possible additions, deletions and revisions by IP. Service Provider will be advised of any such changes by written notification from IP. If warranted, an equitable adjustment shall be negotiated by the parties. If the parties are unable to agree upon an equitable adjustment, then Service Provider may submit a claim in accordance with **Article 15** of this Agreement. Service Provider shall not suspend performance of Services under this Agreement during the review and negotiation of any such change, except as may be directed by IP

**Confidential Pursuant to
Protective Order**

**IP_JRD000517**

**ARTICLE 10. SUSPENSION OF SERVICES.** IP may, at any time, and in whole or in part, by written notice suspend further performance of Services being supplied by Service Provider. Any such notice of suspension shall specify the services being suspended, the date that the suspension shall take effect, and the estimated duration of the suspension. Upon receiving any such notice of suspension, Service Provider shall promptly suspend further performance to the extent specified. IP may at any time withdraw the suspension of performance of the Services, specifying the effective date, and Service Provider shall resume performance of the Services on the specified effective date of withdrawal.

In the event of a suspension of Services, the Service Provider shall have no right, and shall not assert a claim, for lost profits, loss of business opportunity, reassignment costs or any other indirect or consequential costs or damages.

**ARTICLE 11. TERMINATION FOR DEFAULT.** IP may terminate this Agreement for default upon fourteen (14) days written notice and opportunity to cure. If a termination for default is later determined to be unwarranted, then the termination shall automatically convert to a termination for convenience.

**ARTICLE 12. TERMINATION FOR CONVENIENCE.** IP may terminate this Agreement for convenience upon thirty (30) days written notice to Service Provider. Service Provider shall not be entitled to unexpended overhead or unearned profits on Services not furnished. Service Provider shall not be entitled to lost profits or any other indirect, incidental or consequential damages that may be incurred as a result of the termination of Services under this Agreement.

**ARTICLE 13. TAXES, DUTIES AND FEES.** Service Provider shall pay when due, and the compensation set forth herein shall be inclusive of, all local, municipal, sales and use taxes, excise taxes, goods and services taxes, taxes on property owned by Service Provider, duties and all other government fees and taxes or charges of whatever nature applicable to the performance of the Services under this Agreement.

**ARTICLE 14. DOCUMENTATION AND RIGHT OF AUDIT.** If Service Provider provides Services for IP on a cost-plus fee arrangement basis, then Service Provider shall maintain all records and accounts pertaining to Services performed by Service Provider under this Agreement for a period of two (2) years after final payment under this Agreement. IP shall have the right to audit, copy and inspect said records and accounts at all reasonable times during the course of such Services and for the above two (2) year period for the purpose of verifying costs incurred. IP may adjust the amount of Service Provider's compensation based upon the results of such audit(s).

**ARTICLE 15. CLAIMS.**

A.    Service Provider shall give IP notice in writing within seven (7) days of the occurrence of any event which Service Provider believes may give rise to a claim by

**Confidential Pursuant to Protective Order**

**IP_JRD000518**

Service Provider for an increase in the price or in the scheduled time for performance of the Services. Within fourteen (14) days after the occurrence of such event, Service Provider shall supply IP with a written statement supporting Service Provider's claim, which statement shall include causation and Service Provider's detailed estimate of the change in Agreement price and scheduled time for performance of the Services. The claim shall include reasonable documentation substantiating any such claim. IP shall respond to the claim within thirty (30) days. Service Provider agrees to continue performance of the Services during the time any claim is pending.

B.    IP shall not be liable for, and Service Provider hereby unequivocally waives, any claim or potential claim of which Service Provider knew or should have known that was not reported by Service Provider in accordance with **Article 15(A)**. Service Provider agrees that its compensation under this Agreement includes specific consideration for this warranty.

## ARTICLE 16. INSURANCE; HOLD HARMLESS.

1.    Service Provider must at all times maintain the following types and amounts of insurance coverage on policies issued on an "occurrence" basis:

(a)    Workers' Compensation Insurance (or qualification as a self-insurer) sufficient to satisfy the laws of the state(s) in which Service Provider's operations are being performed. Service Provider's Workers' Compensation insurer (or Service Provider, if self-insured) agrees to waive rights of subrogation against IP except for claims caused by IP's sole negligence. Service Provider shall provide for or require any subcontractor to maintain similar coverage for the subcontractor's employees employed in connection with this Project. The insurance required under this Section shall bear an endorsement evidencing a waiver of the right of subrogation against IP and an assignment of statutory lien, if applicable;

(b)    Employer's Liability Insurance that covers both "bodily injury by accident" and "bodily injury by disease" with limits of not less than $1,000,000;

(c)    Commercial General Liability Insurance that covers bodily injury, personal injury, and property damage, including but not limited to products liability, completed operations, and contractual liability coverage, with per occurrence limits of not less than $5,000,000 and an aggregate limit of not less than $5,000,000. Commercial General Liability Insurance shall include "contractual" coverage for the indemnity clause set forth in **Paragraph 6** of this Article. If "defined term denoting scope of contractor's work" involves hazards due to blasting or explosions, or the hazards of the collapse of or structural injury to any building due to excavation, pile driving, shoring, underpinning, etc., then the policy shall be expressly endorsed to cover such hazards;

**Confidential Pursuant to Protective Order**          **IP_JRD000519**

(d)     Automobile Liability Insurance on any owned, non-owned, or hired vehicle, with per occurrence limits for both bodily injury and property damage of not less than $2,000,000; and

(e)     Contractor's Pollution Liability Insurance with per occurrence limits of not less than $2,000,000 and an aggregate limit of not less than $2,000,000. If written on a claims-made basis, such insurance shall provide for a minimum 2-year extended reporting period beyond the latter of (1) the completion of all services by Service Provider, or (2) the expiration of this agreement.

With respect to the insurance provided by Service Provider under subsections 1. (c) and (d) above and (e), Service Provider shall procure from each insurer a waiver of subrogation in IP's favor.

2.      Attorneys' fees and costs shall be in addition to the policy limits set forth above, unless approved in writing by IP.

3.      Service Provider is responsible for payment of all deductibles, self-insured retentions and/or similar charges for the coverage required under this Article.

4.      Service Provider agrees to make IP an additional insured on Service Provider's Commercial General Liability, Automobile Liability, and Contractor's Pollution Liability insurance policies, and will provide IP with copies of policy endorsements reflecting IP's status as an additional insured thereunder. It is hereby agreed that all insurance coverage available to IP under Service Provider's policies will be primary without right of contribution from any other insurance carried by or on behalf of IP, and that all of Service Provider's insurance policies identified above will so indicate.

5.      In addition to the policy endorsements making IP an additional insured under Service Provider's policies, Service Provider will also provide IP with written certificates of insurance evidencing Service Provider's compliance with the requirements of this Article. These certificates of insurance must provide that the policies in force listed therein cannot be canceled for any reason unless IP is given at least thirty days advance written notice of cancellation (except ten days notice for nonpayment of premium). Service Provider hereby agrees that if it fails to furnish the policy endorsements and/or the certificates of insurance required hereunder, or if IP receives notice that any policy of insurance issued to Service Provider has been canceled or no longer meets the requirements of this Article, then IP may 1) suspend this Agreement until insurance is obtained; 2) terminate this Agreement immediately for cause; or 3) obtain forced placement insurance that meets the requirements of this Article at Service Provider's sole cost from any broker or insurer satisfactory to IP.

6.      Indemnity. Service Provider assumes the defense and the entire responsibility and liability for any and all damage or injury of any kind or nature whatsoever (including

Confidential Pursuant to
Protective Order

IP_JRD000520

resulting death) to all persons, whether employed by the Service Provider or otherwise, including but not limited to (a) employees and agents of subcontractors of Service Provider or IP, or (b) any other third party, and to all property (other than the work itself as set out in paragraph 7 below) caused by, resulting from, arising out of, or occurring in connection with the performance by Service Provider, or any subcontractor or agent of Service Provider, of this Agreement. In the event the liability of the Service Provider shall arise by reason of the sole negligence of IP, then and only then, the Service Provider shall not be liable under the provisions of this paragraph. If any person makes a claim for any such damage or injury (including death resulting therefrom) as hereinabove described, the Service Provider agrees to indemnify and save harmless the IP, its agents, servants and employees from and against any and all loss, damage, injury or expense including reasonable attorney's fees that IP may sustain as a result of any such claims, and the Service Provider agrees to assume, on behalf of IP, the defense of any action at law or in equity, which may be brought against IP upon such claim and to pay on behalf of IP upon its demand, the amount of any judgment that may be entered against IP in any such action. In any suit or claim by IP, Service Provider hereby expressly waives any immunity from suit which might otherwise be conferred by the Workers' Compensation laws of any jurisdiction and which would preclude enforcement of the indemnification clause of the Agreement by IP, and Service Provider further agrees to pay any reasonable attorney's fees incurred by IP in securing compliance with the provisions of this indemnification.

7.    Risk of Loss to the Work. IP shall assume such risk of loss to property of IP, Service Provider and any subcontractor as normally insured by an-all-risk property insurance policy which shall cover the Work incorporated in the project and all material for the same stored on the building site and intended for the permanent use therein, except to the extent any damage to property of IP is caused by Service Provider's negligent, grossly negligent, willful or intentional acts. IP shall not be responsible for, and assumes no liability for, any damage however caused to any sheds, equipment, machinery, materials, tools, supplies or personal effects belonging to or rented by Service Provider, any subcontractor, or employees of either. IP, Service Provider and any subcontractors mutually agree to waive the right of subrogation for loss or damage to the property as defined in this paragraph and covered by property insurance.

ARTICLE 17. LIENS. Service Provider shall, at the request of the IP, deliver to IP a certificate that all claims for labor arising under this Agreement have been satisfied and that all bills for any materials or equipment which may have been furnished by Service Provider have been paid. Service Provider, at the request of IP, shall furnish on a monthly basis: (a) a complete release or receipts in full in lieu thereof, of all liens which might arise, and (b) a certificate that such releases and receipts include all labor and materials for which a lien could be filed. If requested by IP, prior to commencing work under this Agreement, Service Provider shall execute a waiver of mechanics' and/or materialmen's liens in a form acceptable to IP.

ARTICLE 18. COMPLIANCE WITH LAWS, RULES AND REGULATIONS. Service Provider covenants and agrees that it will secure and keep in effect all necessary

Confidential Pursuant to
Protective Order

IP_JRD000521

licenses and permits incident to its operations in the performance of this Agreement, and that during the performance of this Agreement, unless exempt, Service Provider agrees to abide by the provisions of all applicable state and federal laws, rules and regulations, all applicable amendments and revisions thereof including, but not limited to, the Occupational Safety and Health Act; the Endangered Species Act; the Clean Water Act; the Federal Insurance Contributions Act; the Internal Revenue Code of 1986; the Fair Labor Standards Act of 1938, including sections 6,7,11,12 and 14; the Americans with Disabilities Act of 1992; Executive Order 13465 for federal contracts in excess of $100,000 and subcontracts in excess of $3,000; National Labor Relations Act, 29 C.F.R. Part 471, Appendix A to Subpart A of Executive Order 13496; the Trafficking Victims Protection Act of 2000; and the applicable requirements of the United States Department of Labor, including the applicable provisions of Executive Order 11246, Section 503 of the Rehabilitation Act of 1973, Section 4212 of the Vietnam Era Veterans' Readjustment Assistance Act of 1974. **Service Provider shall abide by the requirements of 41 CFR §§ 60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex or national origin. Moreover, these regulations require that Service Provider and its contractors/subcontractors take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, national origin, protected veteran status or disability.**

In performance of its obligations under this Agreement, Service Provider agrees to comply with and require its employees, contractors and agents to comply with IP's Supplier Code of Conduct, as well as IP's policies, rules and directions regarding safety, security and appropriate conduct on IP's premises or delivery points and toward IP's employees. IP's Supplier Code of Conduct may be found at http://www.internationalpaper.com/company/suppliers/supplier-code-of-conduct. Service Provider shall be responsible for notifying any of Service Provider's parent, subsidiary and affiliated companies of this Supplier Code of Conduct and its expectations.

Should any governmental entity (including but not limited to entities enforcing the Occupational Safety and Health Act) seek to impose liability on the IP arising out of the work performed under this Agreement, Service Provider agrees to indemnify and hold the IP harmless respecting any such liability including any fines, penalties and reasonable attorney's fees incurred by IP.

**ARTICLE 19. SAFETY AND DRUG TESTING.** Service Provider and its subcontractors shall comply with all local, state, and federal health and safety laws, and environmental laws and regulations applicable to Service Provider in the performance of its services hereunder. While on the premises of IP, Service Provider and its subcontractors shall comply with IP's site-specific regulations and shall ensure that all of its employees, subcontractors and agents have a safe work environment. Service Provider is solely responsible for the safety of Service Provider's employees and the means and methods employed by its employees in performing the services contemplated herein, and agrees

Confidential Pursuant to
Protective Order

IP_JRD000522

that IP shall have no such responsibility. In the event an employee of Service Provider or one of its subcontractors is injured while on IP premises, Service Provider shall (i) immediately notify IP of the time, nature, and severity of the injury, (ii) at its own cost and expense cause to be performed an investigation into the "root cause" of the injury by a competent investigator, and (iii) provide IP with a copy of the investigation report. The report shall include an explanation of causation of the accident and the steps Service Provider or its subcontractor is taking to avoid a similar accident from occurring. Service Provider shall also provide IP with periodic updates on the date the injured employee will return to work. In the event IP elects to perform its own investigation, or requests that a joint investigation be performed, Service Provider shall cooperate and actively assist in such an effort. In addition to the above, if an employee of Service Provider or one of its subcontractors experiences a "near miss" that could have resulted in serious injury while on IP's premises, Service Provider shall investigate the incident and report to IP its findings and the steps that Service Provider will take to avoid a repeat incident.

Service Provider agrees to advise its employees and the employees of its subcontractors and agents that: 1) it is the policy of IP that the use, possession, sale, transfer or purchase of alcohol, drugs, or controlled substances on IP property is prohibited as is the presence on IP property of anyone under the influence of same; 2) entry onto IP property constitutes consent to an inspection of the employee and his or her personal effects when entering, on, or leaving IP property; 3) any employee who is found in violation of the policy or who refuses to permit an inspection may be removed and barred from IP property, at the discretion of IP.

Prior to sending employees to work on IP property, Service Provider will test such employees for the presence of illegal drugs and unauthorized controlled substances and will not permit any applicant or employee who has tested positive to work on IP property. Service Provider will not permit any of its employees to work on IP property who has had a positive test result or who refuses to undergo a test when asked to do so.

Service Provider will require that its subcontractors, representatives, agents or vendors which send employees on IP property to agree to and abide by all of the above provisions, including testing their employees. Test for the presence of illegal drugs or controlled substances refers to a specific analysis of a urine specimen to determine the presence of a specific drug or its metabolites and shall include both an initial test and gas chromotography/mass spectroscopy (GC/MS) confirmatory test.

**ARTICLE 20. <u>MAINTENANCE AND CLEAN-UP OF PREMISES</u>.** Service Provider agrees to keep the area in which Service Provider, its employees, agents, Contractors and Subcontractors are working in a safe and reasonably clean condition during the performance of the Services.

**Confidential Pursuant to
Protective Order**

IP_JRD000523

**ARTICLE 21. SEPARATE CONTRACTS.** This Agreement is non-exclusive with Service Provider. IP reserves the right to award other contracts in connection with the Services provided in this Agreement.

Service Provider agrees to fully coordinate and cooperate with all contractors of IP in the performance and execute of their work and/or services.

If any part of this project depends for proper execution upon the work of any other contractor, Service Provider shall inspect and promptly report to IP any defects in such work that render it unsuitable for such proper execution. Service Provider's failure so to inspect and report shall constitute an acceptance of the other contractor's work as fit and proper for the reception of Service Provider's work, except as to defects which may develop in the other contractor's work after the execution of Service Provider's work.

**ARTICLE 22. SERVICE PROVIDER'S FAMILIARITY WITH CONDITIONS AND SITE.** Service Provider acknowledges that it is familiar with the conditions existing on the site at which the Services will be performed and affirms that there have been no representations by IP beyond those set forth in this Agreement.

**ARTICLE 23. INSPECTION OF WORK.** IP's representative shall at all times have access to the area where the Services are being performed, wherever they are in preparation or progress and Service Provider shall provide proper facilities for such access and for inspection. Service Provider shall make such tests or furnish certificates or other evidence as may be required by specifications or by IP's representatives to show that the requirements of this Agreement have been fulfilled.

**ARTICLE 24. SERVICE PROVIDER'S COMPLETION OF WORK.** If Service Provider fails to perform the Services properly or to perform any provisions of the Agreement, IP, or its agent, may elect after three (3) days written notice to Service Provider, to make good such deficiencies and may deduct the cost thereof from the payment then or thereafter due Service Provider without prejudice to any other remedy IP may have. In addition to any other remedies and rights herein given IP, this Agreement may be terminated if Service Provider is adjudged bankrupt, or makes a general assignment for the benefit of creditors, or if a receiver is appointed on account of Service Provider's insolvency, or if Service Provider refuses or fails, except in cases for which an extension of time is granted by IP, to perform the Services or to perform any provision hereof. If IP takes over and completes the Services by its own force or through another contractor, then IP (without impairing any other right or claim which it may have) may charge the full cost thereof against the unpaid contract price, and may recover from Service Provider any deficiency between the unpaid balance of the contract price and the reasonable cost of completing the Services.

**ARTICLE 25. SERVICE PROVIDER'S DUTIES AND STATUS; WARRANTY.** Service Provider agrees to furnish its best skill and judgment in the performance of its obligations and cooperate with IP and others engaged in work in and about the work area. Service Provider agrees to perform all work hereunder in a safe, good and first

**Confidential Pursuant to Protective Order**

IP_JRD000524

class workmanlike manner, applying thereto at least that degree of skill, care and supervision necessary to be exercised by Service Provider on work of the type covered by this Agreement. Service Provider agrees to furnish skilled workers in the best, most expeditious and economical manner consistent with the interest of IP. All work shall be performed to the satisfaction of IP or its authorized representative.

Service Provider shall continuously maintain adequate protection of all its work and all work of its subcontractors from damage and shall protect IP's property from injury or loss arising in connection with this Agreement.

Service Provider represents and warrants that it shall provide all services hereunder in a good and workmanlike manner and up to the professionally recognized standards in the industry for like services. Should Service Provider fail to provide services up to said standards, Service Provider shall, at IP's option, either (a) re-perform said services or (b) reimburse IP its costs in acquiring said adequate services from a third party.

**ARTICLE 26. LIMITATIONS ON ASSIGNMENT AND SUBCONTRACTS.** Service Provider shall not assign this Agreement, its rights or obligations, without the prior written consent of IP, nor shall Service Provider assign any money due or to become due without the prior written consent of IP. Nothing in this Agreement shall create any contractual relation between any subcontractors and IP, and Service Provider agrees that it is fully responsible to IP for the acts and omissions of subcontractors.

**ARTICLE 27. TIME IS OF THE ESSENCE.** Service Provider and IP agree that time is of the essence in the performance of this Agreement and of each of its covenants and conditions.

**ARTICLE 28. CONFIDENTIALITY AND TRADE SECRETS.** All specifications, data and other information furnished by IP, or its agents, to Service Provider in connection with this Agreement remain the exclusive intellectual property of IP and shall be treated by the Service Provider as proprietary and shall not be disclosed or used, except for implementation of this Agreement, without prior written approval of IP. The purchase of Service Provider's material/services does not authorize Service Provider to use the name of or make reference to IP for any purpose in any releases for public or private dissemination, nor shall Service Provider divulge or use in any advertisement or publication any specifications, data or other information pertaining to or relating to this Agreement or IP without prior written approval from IP.

**ARTICLE 29. INVALIDITY OR UNENFORCEABILITY.** If any provision of this Agreement, of the application thereof to any person or circumstance, shall to any extent be held invalid or unenforceable by a court of competent jurisdiction, the remainder of this Agreement, and the application of such provision to persons or circumstances other than those as to which it is specifically held invalid or unenforceable, shall not be affected thereby, and each and every remaining provision of this Agreement shall be valid and binding to the fullest extent permitted by law.

Confidential Pursuant to
Protective Order

IP_JRD000525

ARTICLE 30. SETOFF. Any payment due to Service Provider under this Agreement, or any other, may, at IP's option be applied by IP to offset any sum which Service Provider may owe to IP or to any subsidiary or affiliate of IP.

ARTICLE 31. ASSIGNMENT AND SUBCONTRACTING. Service Provider shall not assign or subcontract out any portion of the Services without obtaining IP's prior approval.

ARTICLE 32. INDEPENDENT CONTRACTOR. Nothing in this Agreement shall be deemed to construe Service Provider or any of Service Provider's employees to be agents, representatives or employees of IP. Service Provider shall perform its Services as an independent contractor and shall be subject to the direction of IP only with respect to the scope and general results required.

In Louisiana, for work and/or services performed by SUPPLIER at COMPANY'S owned or leased sites, it is further agreed between SUPPLIER and COMPANY that the work being performed by SUPPLIER is part of COMPANY'S trade, business or occupation, and the work performed by SUPPLIER pursuant to this AGREEMENT is an integral part of and essential to the ability of COMPANY to generate COMPANY'S goods, products and/or services. Accordingly, pursuant to La. R.S. 23:1061, COMPANY is the statutory employer of SUPPLIER'S employees, including both direct and statutory employees, performing work under this Agreement. SUPPLIER assumes full responsibility for supervising and directing its employees.

ARTICLE 33. GOVERNING LAW. This Agreement shall be governed and construed according to the laws of Tennessee without regard to any conflict of law provisions thereof.

ARTICLE 34. JURISDICTION. The courts of Tennessee shall have and exclusive jurisdiction over any disputes arising out of or relating to this Agreement.

ARTICLE 35. WAIVER. The failure of either party at any time to insist upon the strict observance of the provisions of this Agreement or to enforce the provisions of this Agreement, or to require at any time performance by the other party of any such provisions, shall in no way be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement, or the right of either party thereafter to enforce each and every provision of this Agreement.

ARTICLE 36. SEVERABILITY. If any part of this Agreement is held by a court to be unenforceable, the remainder of the Agreement shall continue in full force and effect.

ARTICLE 37. ENTIRE AGREEMENT/MODIFICATION. This Agreement, and the materials incorporated herein by reference, constitute the entire agreement between the parties. There are no promises or other agreements, oral or written, express or implied, between the parties other than as set forth in this Agreement. The parties acknowledge that this Agreement supersedes all prior agreements, both written and oral, related to

Confidential Pursuant to
Protective Order

IP_JRD000526

the subject matter of this Agreement. No addition, deletion, or other modification to this Agreement shall be valid unless it is in writing and signed by an authorized representative of each party.

**ARTICLE 38. REMEDIES NOT EXCLUSIVE.** The rights and remedies provided in this Agreement are non-exclusive and are in addition to any other rights and remedies, now or hereafter provided by law.

**ARTICLE 39. PERMITS, BONDS, AND GOVERNMENT OVERSIGHT.** International Paper Company shall obtain and keep current all permits and licenses (except Contractor's license) required to enable the Service Provider to perform the work or services under the Agreement, including but not limited to building, construction, and environmental permits, necessary for compliance with all Federal, State, County and Municipal laws, codes, regulations and ordinances applicable to the performance of the work or services. International Paper Company shall obtain all such permits prior to the date **August 1, 2016,** when the Service Provider commences the work or services. International Paper Company shall be responsible for timely providing notice and reporting to the government and others, as may be required by applicable law.

**ARTICLE 40. FORCE MAJEURE.** Any delays in or failure of performance by IP or Service Provider shall not constitute default hereunder if and to the extent such delays or failures of performance are caused by occurrences beyond the control of IP or Service Provider, as the case may be, including but not limited to: acts of God or the public enemy; expropriation or confiscation of facilities; compliance with any order or request of any governmental authority; act of war, rebellion or sabotage or damage resulting therefrom; fire, floods, explosion, accidents; riots, strikes, labor disputes or other concerted acts of workmen, whether direct or indirect; or any cases, whether or not of the same class or kind as those specifically above named, which are not within the control of IP or Service Provider and which by the exercise of reasonable diligence, IP or Service Provider are unable to prevent.

**ARTICLE 41. NOTICE:** Any notice given pursuant to this Agreement shall be given in writing and delivered in person, by overnight courier, or by registered or certified mail, postpaid, return receipt requested, addressed as follows:

if to IP, to:

International Paper Company
Attn: Manager of Capital and Manufacturing Services
6283 Tri-Ridge Blvd
Loveland, OH 45140-7910

If to Service Provider, to:

JRD Contracting and Land Clearing, Inc.
2100 Camden Bypass
Camden, AL 36726

**Confidential Pursuant to Protective Order**

**IP_JRD000527**

Such notices shall be deemed given at the time of delivery.

**IN WITNESS WHEREOF,** the parties hereunder do execute this Agreement on the date(s) below.

INTERNATIONAL PAPER
COMPANY

By: _Karen Pfpersger_

Title: MANAGER CMS

Date: July 7, 2016

JRD CONTRACTING AND LAND
CLEARING, INC.

By: _____

Title: President

Date: 06/20/2016

INTERNATIONAL PAPER
COMPANY LEGAL

By: _____

Title: _____

Date: _____

Exhibit A – <u>Scope of Services</u>
Exhibit B – <u>Compensation</u>
Exhibit C – <u>Certificate of Agreement</u>
Exhibit D – <u>Key Performance Indicators</u>

**Confidential Pursuant to
Protective Order**

**IP_JRD000528**

EXHIBIT A -- <u>Scope of Services</u>

**Pine Hill Mill**
**7600 Highway 10 West**
**Pine Hill, Alabama 36769**

**Mill Contacts:**

Primary: Joni Harris - Environmental Engineer
Telephone: 334.963.2311
E-mail: joni.harris@ipaper.com

Secondary: Shawn Blenis - EHS&S Manager
Telephone: 334.963.2307
E-mail: shawn.blenis@ipaper.com

Last Edit: 7/8/15 - Joni Harris

**Confidential Pursuant to**
**Protective Order**

**IP_JRD000529**

## 1.0 GENERAL

The mill generates an estimated 440,000 cubic yards of beneficial use material annually. This material is termed organo ash and consists of a mixture of wood and coal ash generated from two power boilers, wood fiber from two paper machines, process waste (lime mud, grit, and dregs material) from the lime kiln, and OCC waste from the paper recycling plant. Residuals are sluiced to one of two holding ponds with a capacity of approximately 110,000 cubic yards for each pond.

Each of the two ash ponds are cleaned twice per year. Organo ash is excavated from ash ponds with the drier material loaded and transported directly to private land owner fields for land application. The wetter material is hauled to the Temporary Storage Area (TSA) for natural gravity dewatering and land applied at a later time.

## 2.0 DETAILED SCOPE OF WORK

Provide all labor, materials, PPE, incidentals, and equipment necessary for cleaning, maintaining and hauling organo from the ash ponds so that the ponds are available for continual use and implementation of a land application program. Primary paper mill organo-ash mixtures consists of hog fuel and coal boiler ash, wood fiber from the mill's primary clarifier underflow, and residuals from the lime kiln.

Techniques for maintaining ash ponds and managing the mill's land application program may include mechanical sludge dewatering, ash pond excavations, beneficial reuse, etc.

Environmental will assign quantity (loads) to each landowner for the calendar year based upon acreage. Contractor will maintain a log on each order and will coordinate with Environmental when order is complete. Trucks will not be required to go through INTERNATIONAL PAPER truck scales. However, the SERVICE PROVIDER shall be required to stamp all bill of lading (BOL) tickets at Security Gate 5 for each load leaving mill site. International Paper reserves the right to weight or inspect loads on a random basis. It is the intent to load each truck to full capacity within the laws of the state of Alabama Highway Department. No loads will be reimbursed without validation of load tickets.

### Safety/Environmental

SERVICE PROVIDER shall be solely and completely responsible for conditions of job site, including safety of all persons and property during performance of the work. This requirement shall apply continuously and not be limited to normal working hours. Safety provisions shall conform to US Department of Labor (OSHA), any State Occupational Safety and Health Act, International Paper policy, and all other applicable federal, state, county, and local laws, ordinances, codes, and any other requirements or regulations that are detailed and or required.

**Confidential Pursuant to Protective Order**

IP_JRD000530

SERVICE PROVIDER will be responsible for documenting and completing all required Mill Designated Representative (MDR) safety reports and/or forms. This includes, but not limited to:

- Safe Plans (execution of work)
- RADARS
- Confined Space Entry
- SERVICE PROVIDER Tailgate Safety Meeting's

Personal Protective Equipment (PPE): (All Furnished By SERVICE PROVIDER)

**General Work Area:**
- Hard hat
- Safety Glasses
- Ear protection (gate to gate policy except as noted in policy, i.e.; inside certain building structures/offices)
- Steel toe shoes
- Personal H2S Monitor (ash pond and temporary storage area (TSA). Monitors must be calibrated on a routine basis. The expiration date must be displayed on each calibrated H2S monitor.

**Laundering of Sludge Contaminated Work Clothes**
- Work clothes should not be laundered in the family washer.
- SERVICE PROVIDER will be responsible for laundering services either on-site or outside contract with a laundering service.

**Administrative Health Controls**
- Contract employees should wash hands thoroughly before eating.

**Housekeeping/Environmental:**
- Soil amendments will be land applied in accordance with the existing application rate and any permit requirements, limitations or company policy requirements in addition to any best management practices and/or agronomic changes or additions conducted at the direction of the owner representative.

- There shall be no land application activities conducted that would harm or endanger human health and welfare, or violate any applicable federal, state or local ordinance, environmental statute, regulation or law.

- SERVICE PROVIDER and employees are responsible for keeping ash ponds, TSA and any other area used by the contractor and employees clean at all times.

- All household garbage should be placed in blue refuse dumpsters located throughout mill site. No household garbage should be placed in the company landfill.

**Confidential Pursuant to Protective Order**          IP_JRD000531

- SERVICE PROVIDER is responsible for disposal of all scrap tires, batteries, used oil and other items generated as a result of contract activities. These must be disposed and/or recycled offsite in accordance with all federal and state regulations.

- Scrap metal should be placed in designated scrap metal dumpsters (free of garbage/trash) located mill wide for recycling. If scrap metal is property of SERVICE PROVIDER, with proper documentation (gate pass), material can be removed from premises.

- No chemicals, lubricants, etc. shall be brought on-site unless approved in advance by Environmental. The appropriate MSDS shall be supplied and stored in our Dolphin system (EHS). These chemicals should be properly labeled and stored in covered secondary containment structures (provided by SERVICE PROVIDER).

- All fuel products, not provided by International Paper will be stored on-site by the SERVICE PROVIDER in double walled tanks and properly labeled. Oil, lubricants, and fuel tanks (supplied by SERVICE PROVIDER) should be stored in an existing concrete containment area with a roof. All such lubricant and chemical containers will be disposed of offsite by SERVICE PROVIDER in accordance with all applicable state laws.

- SERVICE PROVIDER will use concrete wash up area located between lime kiln maintenance shop and purchased bark pile for equipment cleaning. No other area will be permissible.

- SERVICE PROVIDER office/work areas must be kept clean at all times. Random inspections for general housekeeping will be conducted by Environmental.

**Pond Cleaning**
- SERVICE PROVIDER will be required to provide all labor, equipment, and materials to clean each ash pond in 50 working days in order to minimize solids carry-over from the in-service ash pond to the Aerated Stabilization Basin (ASB). The ponds must also be cleaned within this time frame as not to curtail the operation of the power boilers, caustic plant and waste clarifier, which are the streams that make up the pond volume. Each pond averages 110,000 cubic yards of material.

- Cleaning frequency and start dates will be determined by the Environmental department, but typically they are cleaned twice annually.

- SERVICE PROVIDER will be required to repair the ash-sludge pond dikes on a T & M basis as directed by Environmental. NOTE: This refers to dike repairs as identified by International Paper. Damages to dikes as a result of pond cleaning

**Confidential Pursuant to**
**Protective Order**

**IP_JRD000532**

activities by SERVICE PROVIDER will be repaired at SERVICE PROVIDER expense.

- Material too wet (non-stackable) for land application should be stored in the TSA for dewatering purposes.

- SERVICE PROVIDER WILL PROVIDE DUMP TRUCKS WITH A MINIMUM CAPACITY OF 20 CUBIC YARDS FOR ASH DELIVERY TO LANDOWNER.

- The quantity removed from the ash ponds will be determined by International Paper supplied independent survey. International Paper will incur cost for all independent surveys.

- Ash ponds will go through a dewatering process prior to independent survey being conducted. It is the SERVICE PROVIDER's responsibility to dewater ash ponds. The dewatering process will be included in the per cubic yard price of pond cleanings. SERVICE PROVIDER will pump all water that is practical from ash ponds (no free water in solids). One six inch submersible pump will be used a minimum of (five) days. International Paper may wish for the SERVICE PROVIDER to dewater additional days. In this case a daily rate is requested for the additional dewatering. An International Paper representative will give approval to discontinue dewatering, survey will be performed and SERVICE PROVIDER will be given authorization to commence with excavating material from ash pond. Also, SERVICE PROVIDER will ensure that adequate pumping equipment is maintained when dewatering pond so that cleaning is not impeded.

**Performance Timing and Criteria for Pond Cleaning**
- Performance Period. SERVICE PROVIDER has 50 calendar days after the completion of the cross-section survey to completely perform the Services for the sludge pond that is specified in each PO ("Performance Period").

- Inspection Upon Completion. International Paper shall inspect the Services performed by SERVICE PROVIDER upon completion of the Services and shall accept or reject such Services in its reasonable discretion.

- **Effect of Rejection:** Should International Paper reject such Services, SERVICE PROVIDER shall perform additional Services to ensure that the Services are completed as set forth above.

- Failure to Complete Services. Should SERVICE PROVIDER fail to complete the Services prior to the expiration of the Performance Period, SERVICE PROVIDER shall pay liquidated damages in an amount equal to $1,980 per day that the Services remain unperformed under this PO. Further, if International Paper is required to re-open the sludge pond after the Performance Period, but before completion of the Services, International Paper may estimate, in good faith, the

**Confidential Pursuant to Protective Order**

**IP_JRD000533**

portion of the Services that remain unperformed and reduce the total payment due under this PO by the percentage of Services that remain unperformed.

**Organo Ash Hauling**

- Hauling of material to the land application sites shall be in strict accordance with local, state, and federal requirements for vehicles, safety, environmental and other procedures.

- SERVICE PROVIDER will be responsible for furnishing all on-highway fuel and lubricants. Diesel fuel can be placed in the storage tanks used for hauling Organo-ash to land application. International Paper will supply all off-road diesel for onsite activities only, ice, portable toilet, hand wash station, and welding gases. Inspections are done periodically to ensure compliance to these requirements. All fuels should be stored in a properly labeled double-walled tank. If oil stains are visible in containment and at or near SERVICE PROVIDER work area, this must be cleaned up immediately at SERVICE PROVIDER expense.

- SERVICE PROVIDER shall provide all labor, equipment, and materials to transport soil amendments to mill storage facilities and transport soil amendments to designated land application sites. Organo-ash (soil amendments) will be hauled from the ash-sludge ponds directly to land application if the material is dry enough to permit hauling. Organo-ash will also be hauled from the TSA (mill storage facility), as well as other storage areas specified by the facility. Any material hauled from the mill must not be spilled, leaked, disposed or blown during transport.

- All material disposed of offsite will receive International Paper BOL ticket from gate of exit (currently Gate 5). These tickets will be turned in to Environmental prior to any invoicing for land delivery. SERVICE PROVIDER will be reimbursed for actual cubic yards cleaned from pond and/or disposed of in TSA. Land application of this material at later dates will be reimbursed by truck loads based on mileage (chart) to landowner.

- SERVICE PROVIDER should haul an annual quantity of approximately 440,000 cubic yards of material to land application sites or other sites designated by the Environmental. In the event that new technologies are developed or implemented to reduce the frequency of pond cleanings or amount land delivered, International Paper will not guarantee the total annual estimated quantities as noted above.

- SERVICE PROVIDER will coordinate with Environmental to maintain an adequate level of approved land application sites to match Organo-ash generation rates. The facility, according to company policy, will only haul Organo-ash to landowners with acreage equal to or greater than 20 acres. There will be no distribution of ash to any landowner not designated by International Paper Environmental department.

**Confidential Pursuant to
Protective Order**

IP_JRD000534

- SERVICE PROVIDER is responsible for ensuring that the landowner receives no more than 4 loads delivered and spread per physical acre of land over a one-year period. To ensure that this is done, SERVICE PROVIDER shall deliver organo ash at no expense to landowners. If SERVICE PROVIDER is authorized to perform spreading services by International Paper (reimbursable), under no circumstances will International Paper supply off road diesel.

- **SERVICE PROVIDER is responsible for keeping good relations with all landowners participating in the land application program.**

- **SERVICE PROVIDER is responsible for contacting the landowner for information on application sites and haul routes through their property and to ensure that any gates are locked or unlocked as requested by the landowner.**

- **SERVICE PROVIDER is responsible for the repairing of any damage to landowner's property as a result of truck traffic on roads or personal property.**

- SERVICE PROVIDER will provide access from dikes into ponds for cleaning activities. Upon completion of pond cleaning, SERVICE PROVIDER will be responsible for restoring any changes to pond containment structure to normal conditions. ANY ACCESS STRUCTURES BUILT BY SERVICE PROVIDER FOR ENTRANCE AND EXIT OF PONDS CONSIDERED TO BE PERMANENT STUCTURES MUST BE AUTHORIZED IN WRITING BY INTERNATIONAL PAPER.

- Ash stored in TSA will be maintained and included in pond cleaning rates. No additional charges will be billed to the Owner for stacking, moving, etc.

- During inclement weather conditions, the TSA may fill with water. Should this occur, SERVICE PROVIDER will provide labor and material to adequately dewater TSA before hauling ash to landowners. Environmental will determine when sufficient dewatering has been achieved in order to resume hauling.

- SERVICE PROVIDER shall keep records of their progress including the number and location of the loads hauled to individual land application sites. Unannounced random load inspections will be conducted to verify truck weights to ensure that the maximum amount allowed by truck capacity rating is loaded. This will be conducted at the discretion of Environmental and could be by visual inspection or weighed at log scales.

- By Jan 30th of each year, SERVICE PROVIDER must submit to Environmental a copy of records mentioned above from previous calendar year.

**Confidential Pursuant to Protective Order**

IP_JRD000535

**Road Maintenance**

- Roads heavily traveled by SERVICE PROVIDER must be properly maintained. This includes roads in and around, to and from ponds, landfill and TSA. The SERVICE PROVIDER shall provide labor, materials, and equipment to maintain these roads.

- Roads mentioned above must be graded with adequate control measures in place to minimize dust emissions (i.e. watering roads during dry weather conditions, this could entail watering roads everyday of operation).

- All roadways planned to be utilized during the pond cleaning process will meet or be brought up to the following criteria prior to the start of the cleanout process and maintained likewise throughout the cleanout process.

- Roads will be graded to establish positive drainage to ensure continued operational ability even during wet weather conditions. Included will be the maintenance of ditches along the road to facilitate positive drainage and storm water runoff.

- Roadway must be maintained to handle heavy truck traffic associated with the cleanout process but in no way impede light duty traffic required for normal mill operations.

- Repairs and grading will be performed to eliminate potholes and ridges along the operating surface of the road.

- During dry conditions – roadways will be periodically sprinkled to eliminate excessive dusty conditions that could produce unsafe visibility situations and potential inhalation hazards.

- Maintenance cost of the roadways; including materials will be at the SERVICE PROVIDER's expense and should be included in the unit price for the cleanout proposal.

- Emergency Situation

- International Paper reserves the right to use alternate sources in emergency or unusual situations.


## 3.0 TYPES OF WASTE

**Organo Ash**

Wood and coal ash sluiced from power boilers #1 and #2, wood fiber from the paper machines #1 and #2, process waste (lime mud, grit, and dregs material) from the

**Confidential Pursuant to Protective Order**

caustic, and OCC waste from the paper recycling plant. Organo ash moisture content is approximately 66 percent.

**Lime Mud/Grits/Dregs**
Lime mud, grits and dregs are dumped on a concrete pad on the west end of the lime kiln area and mixed. The material is hauled by mill personnel to the TSA and staged on the southeast corner only. SERVICE PROVIDER is required to place one bucket load (approximately one yard) of mixed material in the dumpster truck already loaded with organo ash.

### Table:1 Historical Volumes for Individual Streams

| Waste Description | 2013 Cubic Yards | 2014 Cubic Yards | 2015 RFP Cubic Yards |
|---|---|---|---|
| Organo Ash | 414,027 | 368,412 | 400,000 |
| Lime Mud/Grits/Dregs | 10,000 (estimate) | 10,000 (estimate) | 10,000 (estimate) |

**Confidential Pursuant to Protective Order**

IP_JRD000537

## 4.0 WASTE HAULING PROCESS DIAGRAM



**Confidential Pursuant to
Protective Order**

**IP_JRD000538**

## EXHIBIT B - Compensation

Service Provider shall be compensated for the Scope of Services performed on Net Sixty (60) basis per the Table 1: Unit Rate Cost Schedule listed below and incorporated herein. The Service Provider shall be allowed to adjust labor rates twice during the contract term: Year 3 and Year 5, contingent upon high level of performance and meeting or exceeding agreed-upon Key Performance Indicators (KPIs) outlined in Exhibit E – Key Performance Indicators. However, in no event shall the adjustment exceed three (3) percent. The new unit rates shall be calculated upon the methodology outlined in Attachment 1 – Unit Rate Adjustment Formula.

Any onsite stacking of organo ash and hauling within the mill site shall be included in rate structure above.

## COST OF FUEL
Since the cost of energy is subject to fluctuation over the term of the Agreement, International Paper shall reimburse the Service Provider for the actual price paid per gallon for diesel fuel used exclusively to perform the work outlined in this Agreement on a pass-through cost basis. There shall be no mark-up added to the cost of fuel. Fuel charges will be handled via a separate purchase order.

A copy of all diesel fuel vendor invoices for diesel shipments received and referenced for that period showing the date purchased and actual price per gallon paid by the Service Provider shall be attached to each invoice as back up documentation. The Service Provider shall use its best efforts to purchase diesel fuel at commercially reasonable rates with the goal of minimizing any fuel costs that are billable to International Paper.

A copy of the invoice, marked "copy" prominently on the top of the invoice with copies of the diesel fuel vendors invoices for fuel purchased covering the invoice period should be mailed to Purchasing Manager at International Paper Pine Hill Mill. All invoices must contain the applicable purchase order number.

## OTHER
Direct Materials are estimated at $40,000 annually. Invoices are to be submitted on monly basis for the Mill Purchasing Manager's review and approval.

The mark-up on Subcontractors, Third Party Rentals, and Purchased Materials in scope of this Agreement is five (5) percent.

**Confidential Pursuant to
Protective Order**

IP_JRD000539

**Table 1: Unit Rate Cost Schedule**
Table below defines costs as billed to Pine Hill Mill

| Tasks: | YR 1 | YR 2 | YR 3 | YR 4 | YR 5 |
|---|---|---|---|---|---|
| Off-Site Ash Hauling, Delivery, and Spreading (<= 10 miles each way) | $50.36 per truckload | $50.36 per truckload | $50.36 per truckload | $50.36 per truckload | $50.36 per truckload |
| Off-Site Ash Hauling, Delivery, and Spreading (10 - 20 miles each way) | $61.09 per truckload | $61.09 per truckload | $61.09 per truckload | $61.09 per truckload | $61.09 per truckload |
| Off-Site Ash Hauling, Delivery, and Spreading (>20 miles each way) | $79.49 per truckload | $79.49 per truckload | $79.49 per truckload | $79.49 per truckload | $79.49 per truckload |
| Ash Pond Cleaning | $1.85 per cubic yard | $1.85 per cubic yard | $1.85 per cubic yard | $1.85 per cubic yard | $1.85 per cubic yard |

**Confidential Pursuant to
Protective Order**

**IP_JRD000540**

## Attachment 1 – Unit Rate Adjustment Formula

New unit rate adjustments shall be calculated and submitted for Global Sourcing Contract Administrator's Approval by July 1st of the Year 3 and Year 5, and, upon obtainig approval, shall take effect on August 1st of the same years.

Adjusted unit rates shall be calculated as follows:

1.  Previous  year's total labor and equipment cost breakdown is calculated for each task:

    Example: Total Cost of Ash Pond Cleaning Yr 2 = $750,000, of which $300,000 (40%) is attributable to total labor cost and $450,000 (60%) is attributable to total equipment cost. The cost per cubic yard YR 2 = $1.85 per cubic  yard and 405,405 cubic yards of ash were removed from the ash pond.

2.  Assuming, that the agreed-upon cost of living adjustment = 2.5% in YR 3, then the following formula shall be used to calculate new unit rate for Ash Pond Cleaning:

    New Unit Rate = [Previous year's unit rate * labor portion * (1+ cost of living adjustment)] + [Previous year's unit rate * equipment portion]

    Example:
    YR 3 Unit Rate for Ash Pond Cleaning = [$1.85 * 40% * (1+2.5%)] + [$1.85 * 60%] = $1.87 per cubic yard

**Confidential Pursuant to**
**Protective Order**

**IP_JRD000541**

**Table 2: Labor Rates**
Table below defines labor rates for the additional as needed work

| Labor Rates | Foreman | Lead Operator | Lead Operator I | Tandem Truck Driver | Laborer |
|---|---|---|---|---|---|
| Base Rate | $18.75 | $20.00 | $16.00 | $12.00 | $10.00 |
| FICA | 7.65% | 7.65% | 7.65% | 7.65% | 7.65% |
| FUI | 0.60% | 0.60% | 0.60% | 0.60% | 0.60% |
| SUI | 7.04% | 7.04% | 7.04% | 7.04% | 7.04% |
| Health/Fringes | 0.04% | 0.04% | 0.00% | 0.00% | 0.00% |
| W/Comp. | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% |
| Liability Insurance | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% |
| Overhead | 7.50% | 7.50% | 7.50% | 7.50% | 7.50% |
| Profit | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% |
| Sm. Tools/Consumables | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| **Total MarkUp** | **32.83%** | **32.83%** | **32.79%** | **32.79%** | **32.79%** |
| **Total Straight Time Hourly Cost** | **$24.91** | **$26.57** | **$21.25** | **$15.93** | **$13.28** |
| FICA | 7.65% | 7.65% | 7.65% | 7.65% | 7.65% |
| FUI | 0.60% | 0.60% | 0.60% | 0.60% | 0.60% |
| SUI | 7.04% | 7.04% | 7.04% | 7.04% | 7.04% |
| Health/Fringes | 0.04% | 0.04% | 0.00% | 0.00% | 0.00% |
| **Total OT Markup** | **15.33%** | **15.33%** | **15.29%** | **15.29%** | **15.29%** |
| **Total Overtime Hourly Cost** | **$35.72** | **$38.10** | **$30.47** | **$22.85** | **$19.04** |

**Confidential Pursuant to Protective Order**

IP_JRD000542

**Table 2: Labor Rates (Continued)**
Table below defines labor rates for the additional as needed work

| Labor Rates | Water Truck Driver | Office Assistant |
|---|---|---|
| Base Rate | $12.00 | $18.75 |
| FICA | 7.65% | 7.65% |
| FUI | 0.60% | 0.60% |
| SUI | 7.04% | 7.04% |
| Health/Fringes | 0.00% | 0.04% |
| W/Comp. | 2.00% | 2.00% |
| Liability Insurance | 3.00% | 3.00% |
| Overhead | 7.50% | 7.50% |
| Profit | 5.00% | 5.00% |
| Sm. Tools/Consumables | 0.00% | 0.00% |
| Total MarkUp | 32.79% | 32.83% |
| Total Straight Time Hourly Cost | $19.93 | $18.75 |
| FICA | 7.65% | 7.65% |
| FUI | 0.60% | 0.60% |
| SUI | 7.04% | 7.04% |
| Health/Fringes | 0.00% | 0.04% |
| Total OT Markup | 15.29% | 15.33% |
| Total Overtime Hourly Cost | $22.85 | $24.91 |

**Confidential Pursuant to
Protective Order**

**IP_JRD000543**

**Table 3: Equipment Rates**
Table below defines equipment rates for the additional as needed work

| Equipment Rates | Equpment Details: Model / Hp | Hourly Rate | Profit % | T&M Rate |
|---|---|---|---|---|
| Excavator | KOMATSU PC490-359 HP | $ 85.28 | 5% | $89.54 |
| Excavator | KOMATSU PC360-11-257 HP | $ 75.00 | 5% | $78.75 |
| Hydraulyc Pump | COWIN 6" HYDRAULIC PUMP | $10.00 | 5% | $10.50 |
| Tandem Dump Truck | Tandem Dump Truck | $31.25 | 5% | $32.81 |
| Crew Pickup | Crew Pickup | $15.00 | 5% | $15.75 |
| Foreman Pickup | Foreman Pickup | $15.00 | 5% | $15.75 |
| Tri-Axle Dump Truck | Tri-Axle Dump Truck | $70.00 | 5% | $73.50 |
| Dozer | KOMATSU D39PX-23 - 105 HP | $35.74 | 5% | $37.53 |
| Water Truck | Tandem 4,000 Gallon | $31.25 | 5% | $32.81 |
| Motor Grader | CATERPILLAR 140G-200 HP | $38.84 | 5% | $40.78 |

**Confidential Pursuant to
Protective Order**

IP_JRD000544

## EXHIBIT C -- <u>Certificate of Agreement</u>

### ADMINISTRATIVE CONTROLS AND SERVICE PROVIDER RESPONSIBILITIES

Prior to awarding any contract for work to be performed, International Paper (the COMPANY) requires the SERVICE PROVIDER to agree, by signing this certificate of AGREEMENT, to follow COMPANY administrative controls as described below. This certificate will be part of the bid proposal package.

The SERVICE PROVIDER agrees to follow the COMPANY administrative controls and SERVICE PROVIDER responsibilities without exception. The attached addenda, Addendum A and B, are an integral part of this AGREEMENT, are incorporated by reference and are binding on the SERVICE PROVIDER.

### OVERALL RESPONSIBILITY OF THE SERVICE PROVIDER

It is the responsibility of the SERVICE PROVIDER to follow COMPANY practices and procedures related to administrative controls, and to provide the COMPANY with the required documentation to support invoiced charges.

It is the responsibility of the SERVICE PROVIDER to ensure that the SERVICE PROVIDER'S employees are informed of COMPANY administrative controls, and that they follow without exception required administrative practices and procedures.

If COMPANY administrative procedures are not followed and required documentation is not submitted, the COMPANY will withhold payment for non-supported charges and notify the SERVICE PROVIDER of the reason.

### GENERAL ADMINISTRATIVE CONTROLS

### GATE ENTRY AND EXIT LOG

It is the responsibility of the SERVICE PROVIDER'S representative to ensure that each of the SERVICE PROVIDER'S employees, including foremen and supervisors, properly record their entry and exit times from mill property. A COMPANY representative will monitor the gate entry and exist activity and corresponding records.

With the exception of a shut-down, the COMPANY uses the following two primary methods of record entry and exit. Entry and exit methods during a shut down are specified on Addendum A.

### INGRESS AND EGRESS AT MILS USING MECHANIZED CARD READERS

**Confidential Pursuant to
Protective Order**

IP_JRD000545

For those mills using mechanized card readers, each of the SERVICE PROVIDER'S employees will be issued an identification card on their initial work-date at the mill. Upon issuance of the cards, the SERVICE PROVIDER'S employee will be required to sign in on the SERVICE PROVIDER'S in/out log. Each subsequent workday, the SERVICE PROVIDER'S employees will be required to present their identification card to be read at the gate.

If the SERVICE PROVIDER'S employee loses their identification card, a twenty dollar replacement fee will be deducted from the COMPANY'S next payment to the SERVICE PROVIDER. If the SERVICE PROVIDER'S employee fails to bring their identification card to the COMPANY work site, the SERVICE PROVIDER'S employee will be required to sign in and out on the SERVICE PROVIDER'S in/out log and a five dollar administrative fee per occurrence will be deducted from the COMPANY'S next payment to the SERVICE PROVIDER.

## INGRESS AND EGRESS AT MILLS USING SERVICE PROVIDER IN/OUT SHEETS

For those mills using SERVICE PROVIDER in/out log sheets, each of the SERVICE PROVIDER'S employees will be required to sign their full signature, write their I. D. number and record the current time on the log sheet corresponding to the type of job on which they will work. Separate SERVICE PROVIDER log sheets will be maintained for cost-plus jobs and for lump-sum jobs if separate crews are maintained for cost-plus and for lump-sum jobs.

Each SERVICE PROVIDER shall have a designated work schedule that begins at their designated work site. COMPANY payments for hours worked will be in accordance with the designated work schedule. Unless approved in advance in writing by a COMPANY representative, the SERVICE PROVIDER'S employees gate log hours subject to COMPANY payment will begin no earlier than their scheduled start time. Any exit recorded prior to or entrance recorded after scheduled work time will result in a minimum deduction of on-half hour from the gate log hours. Also, an appropriately scheduled lunch time will be deducted from gate log hours.

The gate entry log for entry and exit, mechanized or manual, will be the COMPANY'S primary source to verify SERVICE PROVIDER hours worked for cost-plus work. If the SERVICE PROVIDER'S gate log for entry and exit is not completed in accordance with COMPANY requirements or if the hours invoiced do not agree with the gate logs, payment will be made to the SERVICE PROVIDER based on the hours shown on gate logs.

## PREPARATION OF SERVICE PROVIDER WEEKLY REPORTS FOR COST-PLUS WORK OR LUMP-SUM WORK PERFORMED CONCURRENTLY WITH COST PLUS

**Confidential Pursuant to Protective Order**

**IP_JRD000546**

Each SERVICE PROVIDER performing cost-plus work for the COMPANY is required to prepare a SERVICE PROVIDER'S Weekly Report (CWR) for each weekly period of time during which work on a cost-plus job is performed. Also, a CWR is required for a lump-sum job being performed concurrently with a cost-plus job. The weekly period is to correspond to the SERVICE PROVIDER'S payroll period ending day and date. A CWR form and relevant reporting requirements are specified on Addendum B.

The SERVICE PROVIDER will submit properly completed CWRs to a COMPANY representative within one-work day of the CWR ending period for approval. It is not necessary for the CWR to include extensions; however, the SERVICE PROVIDER will have to submit an extended copy with the invoice. It is the responsibility of the SERVICE PROVIDER to obtain a copy of the approved CWR from a COMPANY representative before submission of invoice. The COMPANY representative will forward the original CWR to the Memphis Accounting Center.

## SUBMISSION OF SERVICE PROVIDER'S INVOICES

Separate invoices are required for each COMPANY purchase order. For cost-plus work, invoices must additionally be grouped by week and be accompanied by completed and approved CWR reports for the period covered. Invoices may be submitted at the SERVICE PROVIDER'S discretion unless specified in the contract documents; however, they must be submitted in AGREEMENT with the time ending date reflected on supported CWR.

The COMPANY is committed to paying each SERVICE PROVIDER'S invoice in accordance with the terms of the purchase order or the contract, and the conditions of this Certificate of AGREEMENT.

If the COMPANY is unable to verify charges on the SERVICE PROVIDER'S invoice due to the SERVICE PROVIDER'S failure to follow administrative controls or provide adequate supporting documentation, the COMPANY will withhold payment for any contested charges.

If payments are withheld from the SERVICE PROVIDER'S invoice, the COMPANY will notify the SERVICE PROVIDER in writing to advise the reason for the withheld payment. It is the responsibility of the SERVICE PROVIDER to provide missing or additional supporting documentation to the COMPANY. The COMPANY will provide assistance to the SERVICE PROVIDER by direct request; however, if COMPANY employees perform work in addition to the normal invoice verification process, the COMPANY reserves the right to charge the SERVICE PROVIDER at the COMPANY'S cost of such work.

## AUDIT OF SERVICE PROVIDER'S RECORDS

**Confidential Pursuant to**
**Protective Order**

The method for auditing SERVICE PROVIDER'S records will be at the discretion of the COMPANY. Methods for SERVICE PROVIDER audits include the following:

Submission by mail of selected payment records as requested by the COMPANY such as payroll registers and check copies.

On-site visits by the SERVICE PROVIDER'S representative(s) at the COMPANY'S Accounting Center in Memphis, Tennessee.

On-site visits by the COMPANY'S representative(s) at the SERVICE PROVIDER'S office where invoice supporting documentation is retained.

The frequency and extent of SERVICE PROVIDER audits will be determined at the discretion of the COMPANY.

**SIGNATURE OF SERVICE PROVIDER'S REPRESENTATIVE**

I, _JOHN R. DAILEY JR  PRESIDENT_____(Name/Title), as an authorized

representative of _JRD CONTRACTING AND LAND CLEARING, INC_ (SERVICE

PROVIDER) have read, understand, and provide assurance that

_JRD CONTRACTING AND LAND CLEARING, INC_(SERVICE PROVIDER) agrees to follow the

administrative controls of International paper and to fulfill the SERVICE PROVIDER

responsibilities specified in this Certificate of AGREEMENT for the attached contract

identified as _MPWSPH 16_____ copy attached.

**Confidential Pursuant to
Protective Order**

**IP_JRD000548**

## CERTIFICATE OF AGREEMENT
## ADMINISTRATIVE CONTROLS AND SERVICE PROVIDER RESPONSIBILITIES

### ADDENDUM A
### GATE ENTRY AND EXIT LOG PROCEDURES DURING A SHUT DOWN

If there are planned deviations to the procedures related to this AGREEMENT concerning administrative controls, they will be provided by the COMPANY representative and specifically documented on Addendum A as a part of the Certificate of AGREEMENT submitted to the SERVICE PROVIDER.

This addendum will be prepared primarily for shut-down periods and will generally specify alternative gate log or material receipts procedures.

**Confidential Pursuant to
Protective Order**

**IP_JRD000549**

**CERTIFICATE OF AGREEMENT**
**ADMINISTRATIVE CONTROLS AND SERVICE PROVIDER RESPONSIBILITIES**

**ADDENDUM B**
**SERVICE PROVIDER WEEKLY REPORT**

Each SERVICE PROVIDER performing cost-plus work for the COMPANY is required to prepare a SERVICE PROVIDER'S Weekly Report (CWR) for each purchase order covering cost-plus work. The CWR is also required for purchase orders covering lump-sum work when the SERVICE PROVIDER is performing lump-sum work concurrently with cost-plus work. Also, a summary CWR is required for all work performed during the weekly period of the CWR when the contrctor is performing work on more than one purchase order. A CWR form is attached.

Instructions for Completing CWR:

The instructions for completion are on the back of the attached SERVICE PROVIDER Weekly Report (CWR).

**Confidential Pursuant to**
**Protective Order**

**IP_JRD000550**

**Exhibit D -- <u>Key Performance Indicators</u>**

The items below, along with any agreed-upon mill-specific performance indicators shall become incorporated into Service Providers' Performance Scorecard. The Service Provider's performance will be reviewed with the Service Provider per the Performance Scorecard on quarterly basis.

- **Zero LIFE Incidents (Safety Record)**
- On-Time
- Problem Resolution
- Response Time for Emergency/Upset Conditions
- Reporting Consistency, Timeliness, and Accuracy
- **Continuous Improvement**

**Additional Reporting Requirements:**
- Equipment Hours Worked (per piece of equipment)
- Labor Hours Worked (per labor category)
- Scope of Work Changes (note any changes to the scope of work and the impact)
- Volumes of Material Moved
- Any additional work performed outside of the Scope of Work (job description and associated cost)

**Confidential Pursuant to
Protective Order**

**IP_JRD000551**

# EXHIBIT 2

REL: March 1, 2019

**Notice:** This opinion is subject to formal revision before publication in the advance
sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**,
Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-
0649), of any typographical or other errors, in order that corrections may be made before
the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2018-2019

————————————

### 1180144

————————————

**Ex parte International Paper Company, Janet Pridgeon, Joni
Harris, and Shawn Blenis**

**PETITION FOR WRIT OF MANDAMUS**

**(In re: Caterpillar Financial Services Corporation**

**v.**

**JRD Contracting, Inc., et al.)**

**(Wilcox Circuit Court, CV-16-900061)**

SHAW, Justice.

International Paper Company ("International Paper") and

three of its employees--Janet Pridgeon, Joni Harris, and Shawn

1180144

Blenis (hereinafter referred to collectively as "IPC")--the defendants in a third-party action pending below, petition this Court for a writ of mandamus directing the Wilcox Circuit Court to vacate its order denying IPC's motion to dismiss the action against it without prejudice based on improper venue. We grant the petition and issue the writ.

## Facts and Procedural History

In 2015, Caterpillar Financial Services Corporation ("Caterpillar") entered into various loan and guaranty agreements with JRD Contracting, Inc. ("JRD"), and its president, John R. Dailey, Jr. ("Dailey"), for the purchase of certain equipment. That equipment was to serve as collateral for the loans between Caterpillar and JRD. According to Caterpillar, JRD and Dailey failed to pay the amounts due under the loan agreements, and, in September 2015 and again in December 2015, Caterpillar notified JRD and Dailey of its intention to accelerate the loans and to make demand for the return of the equipment.

In the summer of 2016, Dailey, on behalf of JRD Land Contracting and Land Clearing, Inc. ("JRD C&L"),[1] signed an

---

[1]JRD C&L appears to be a corporation separate from JRD. Dailey is apparently also the president of JRD C&L.

1180144

agreement with International Paper called the "International Paper Company Pine Hill Mill Waste Services Agreement" ("the waste-services agreement"), in which JRD C&L agreed to dispose of International Paper's waste at its Pine Hill Mill for a period of five years.

Later in 2016, Caterpillar sued JRD and Dailey in the Wilcox Circuit Court alleging a claim of detinue and seeking damages for breach of contract and breach of the guarantees. Caterpillar alleged that the defendants failed to pay amounts owed on their loans, and it sought to recover possession of the equipment held as collateral.

After performing work for International Paper under the waste-services agreement for eight months, JRD C&L received a letter from International Paper on April 6, 2017, providing 30 days' written notice of International Paper's intent to terminate the waste-services agreement.

In May 2017, JRD and Dailey filed in the pending Wilcox Circuit Court action a third-party complaint against IPC and fictitiously named defendants. In their complaint, JRD and Dailey sought a declaratory judgment and damages on claims of breach of contract, promissory estoppel, fraud, work and labor

3

1180144

done, and indemnity. According to JRD and Dailey, in an effort to perform the obligations under the waste-services agreement, they hired additional labor and also leased, purchased, and financed various items of equipment from third parties, including Caterpillar. They alleged that they acquired that equipment and entered into those loan agreements only in reliance on International Paper's alleged assurance that they would be compensated for their work over a five-year period. When International Paper terminated that agreement, JRD and Dailey alleged, they could no longer afford to pay the loans from their lenders, including Caterpillar, although they had already defaulted on some of those loans.

Later that same month, JRD and Dailey moved the trial court to add JRD C&L as a defendant to the action involving Caterpillar. According to JRD and Dailey, adding JRD C&L as a defendant was proper because JRD C&L had possession of the equipment that Caterpillar was seeking to recover. JRD C&L was also, as noted above, the signatory to the waste-services agreement with International Paper, which was at issue in the third-party action. The trial court granted that motion. Thereafter, JRD, Dailey, and JRD C&L filed an amended third-

1180144

party complaint adding JRD C&L as a third-party plaintiff (JRD, Dailey, and JRD C&L are hereinafter referred to collectively as "the third-party plaintiffs").

In June 2017, IPC moved, pursuant to Rule 12(b)(3), Ala. R. Civ. P., to dismiss the third-party complaint based on improper venue. According to IPC, the waste-services agreement contained an outbound forum-selection clause that provided that the courts of Tennessee would have jurisdiction over any disputes arising out of or relating to that agreement. IPC also challenged whether JRD or Dailey had a right to bring the third-party action because, it argued, the third-party action had nothing to do with the transactions underlying Caterpillar's lawsuit.

The trial court did not rule on IPC's motion to dismiss, and IPC petitioned this Court for a writ of mandamus directing the trial court to rule on the motion. On April 27, 2018, this Court granted IPC's petition and directed the trial court to address the merits of IPC's motion. See Ex parte International Paper Co., [Ms. 1170458, April 27, 2018] ____ So. 3d ____ (Ala. 2018). On November 7, 2018, the trial court denied the motion, and IPC filed the present petition.

1180144

## Standard of Review

"'"Mandamus is a drastic and extraordinary writ, to be issued only where there is (1) a clear legal right in the petitioner to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court." Ex parte Integon Corp., 672 So. 2d 497, 499 (Ala. 1995).'

"Ex parte CTB, Inc., 782 So. 2d 188, 190 (Ala. 2000). In Ex parte CTB, this Court established that a petition for a writ of mandamus is the proper vehicle for obtaining review of an order denying enforcement of an 'outbound' forum-selection clause when it is presented in a motion to dismiss. Indeed, an attempt to seek enforcement of the outbound forum-selection clause is properly presented in a motion to dismiss without prejudice, pursuant to Rule 12(b)(3), Ala. R. Civ. P., for contractually improper venue. Additionally, we note that a party may submit evidentiary matters to support a motion to dismiss that attacks venue. Williams v. Skysite Communications Corp., 781 So. 2d 241 (Ala. Civ. App. 2000), quoting Crowe v. City of Athens, 733 So. 2d 447, 449 (Ala. Civ. App. 1999)."

Ex parte D.M. White Constr. Co., 806 So. 2d 370, 372 (Ala. 2001). Further, "a trial court's ruling on the question of enforcing a forum-selection clause" will be vacated if the court exceeded its discretion. Id.

## Discussion

### I.

6

1180144

IPC argues that, generally, outbound forum-selection clauses are enforceable in Alabama and that the third-party plaintiffs did not establish that the enforcement of the clause would be unfair or unreasonable. According to IPC, because the third-party plaintiffs failed to meet their burden, the outbound forum-selection clause should be enforced. For the reasons discussed below, we agree.[2]

------------

[2]Initially, we note that the third-party plaintiffs contend that IPC waived its forum-selection-clause argument when, they say, it removed the underlying action to federal court in October 2017. This Court has previously stated:

> "[A] party may waive its right to enforce a forum-selection clause, as it may with other contract provisions, by evincing an intention to do so. We note that no rigid rule exists for determining what constitutes a waiver of the right to enforce a forum-selection clause; the determination whether there has been a waiver must, instead, be based on the particular facts of each case."

Ex parte Spencer, 111 So. 3d 713, 718 (Ala. 2012) (emphasis added).

In the present case, both the petition and the answer indicate that IPC filed its motion to enforce the outbound forum-selection clause months before it filed its motion to remove the case to federal court, which occurred before the trial court ruled on the motion to dismiss. Under these facts, IPC did not evince an intent to waive its right to enforce the outbound forum-selection clause.

1180144

It is well established that an outbound forum-selection clause

> "'will be "upheld unless the party challenging the clause clearly establishes that it would be unfair or unreasonable under the circumstances to hold the parties to their bargain." Ex parte CTB, Inc., 782 So. 2d [188,] 190-91 [(Ala. 2000)]. The showing is sufficient where it is clearly established "'(1) that enforcement of the forum selection clause[] would be unfair on the basis that the contract[] [was] affected by fraud, undue influence, or overweening bargaining power or (2) that enforcement would be unreasonable on the basis that the chosen ... forum would be seriously inconvenient for the trial of the action.'" Id. at 191 ....'
>
> "Ex parte Leasecomm Corp., 886 So. 2d [58,] 62-63 [(Ala. 2003)] (emphasis omitted). The Court has noted that '[t]he burden on the challenging party is difficult to meet.' Ex parte D.M. White Constr. Co., 806 So. 2d [370,] 372 [(Ala. 2001)]."

Ex parte PT Solutions Holdings, LLC, 225 So. 3d 37, 42 (Ala. 2016).

The waste-services agreement includes an unambiguous outbound forum-selection clause that states: "The Courts of Tennessee shall have ... exclusive jurisdiction over any disputes arising out of or relating to this agreement."

As demonstrated by the caselaw quoted above, the burden was on the third-party plaintiffs to demonstrate that

1180144

enforcement of the outbound forum-selection clause would be unfair or unreasonable under the circumstances of this case. In its petition, IPC contends that the third-party plaintiffs failed to establish that enforcement of the clause would be unfair on the basis that the waste-services agreement was affected by fraud, undue influence, or overweening bargaining power.

The third-party plaintiffs argue to this Court that the enforcement of the outbound forum-selection clause would be unfair because, they say, it was affected by International Paper's "overweening bargaining power" given their allegation that International Paper is a large, multinational corporation and they are individual and small, local companies.[3] According to the third-party plaintiffs, International Paper "held all the cards" during the negotiations of the waste-services agreement and the third-party plaintiffs were given "zero opportunity to negotiate [the waste-services agreement]" because, they say, it was a "'take it or leave it' deal."

_____

[3]We note that the third-party plaintiffs do not argue that enforcement of the clause would be unfair as a result of fraud or undue influence.

1180144

This Court has previously held that, even when a party to a forum-selection clause is a large company, there are allegations that one of the parties was not allowed to negotiate any of the terms of the contract, and the contract had to be accepted as written, those factors alone do not establish "overweening bargaining power." See Ex parte D.M. White Constr., 806 So. 2d at 373. Additionally, the third-party plaintiffs' assertions appear to be nothing more than conclusory and, without more, are insufficient to establish that enforcing the outbound forum-selection clause would be unfair. 806 So. 2d at 372 (holding that the respondent's conclusory assertions did not establish that enforcement of the outbound forum-selection clause would be unfair or unreasonable). Thus, under these circumstances, the third-party plaintiffs have failed to establish that enforcement of the outbound forum-selection clause would be unfair.

Next, IPC argues that the third-party plaintiffs cannot establish that the clause is unreasonable because, it contends, Tennessee is not a "seriously inconvenient" forum in the present case. The third-party plaintiffs argue, however, that Tennessee would be a "massively inconvenient" forum

1180144

because, they argue, witnesses would be required to travel to Tennessee for the proceedings and Tennessee "really has nothing to do with this dispute." They also contend that International Paper's termination of the waste-services agreement has "essentially bankrupted" them, making it "impossible" to bear the expense of conducting litigation in Tennessee.

In addressing whether the distance to a forum selected by an outbound forum-selection clause would be "seriously inconvenient," this Court has previously stated that

> "'distance of travel does not establish that a forum is unreasonable. Ex parte Northern Capital Res. Corp., 751 So. 2d 12 (Ala. 1999) (enforcing outbound forum-selection clause requiring that litigation be conducted in Missouri); O'Brien Eng'g Co. v. Continental Machs., Inc., [738 So. 2d 844 (Ala. 1999)] (enforcing outbound forum-selection clause requiring that litigation be conducted in Minnesota); Moseley v. Electronic Realty Assocs., 730 So. 2d 227 (Ala. Civ. App. 1998) (enforcing outbound forum-selection clause requiring that litigation be conducted in Kansas); and Professional Ins. Corp., et al. v. Sutherland, 700 So. 2d 347 (Ala. 1997) (enforcing outbound forum-selection clause requiring that litigation be conducted in Florida).'

"Ex parte D.M. White Constr. Co., 806 So. 2d at 373-74. A complaining party must cite more than mere

11

1180144

> distance to warrant negating the forum-selection
> clause. '"Inconvenience" sufficient to void a
> forum-selection clause is present where a "trial in
> that forum would be so gravely difficult and
> inconvenient that the challenging party would
> effectively be deprived of his day in court."' Ex
> parte Leasecomm Corp., 886 So. 2d [58,] 62-63 [(Ala.
> 2003)] (quoting Ex parte Rymer, 860 So. 2d 339, 342
> (Ala. 2003))."

Ex parte PT Solutions, 225 So. 3d at 46. In addressing whether

a party has established that a chosen forum itself is

"seriously inconvenient," this Court has used the following

five factors for guidance:

> "'"(1) Are the parties business
> entities or businesspersons? (2)
> What is the subject matter of the
> contract? (3) Does the chosen
> forum have any inherent
> advantages? (4) Should the
> parties have been able to
> understand the agreement as it
> was written? (5) Have
> extraordinary facts arisen since
> the agreement was entered that
> would make the chosen forum
> seriously inconvenient? We state
> these items not as requirements,
> but merely as factors that,
> considered together, should in a
> particular case give a clear
> indication whether the chosen
> forum is reasonable."'"

Ex parte Nawas Int'l Travel Serv., Inc., 68 So. 3d 823, 827

(Ala. 2011)(quoting Ex parte Rymer, 860 So. 2d 339, 343 (Ala.

1180144

2003), quoting in turn <u>Ex parte Northern Capital Res. Corp.</u>, 751 So. 2d 12, 15 (Ala. 1999)).

As the above authority indicates, the mere fact that in the present case witnesses would have to travel to Tennessee is not a sufficient reason to avoid the operation of a validly agreed-upon forum-selection clause. Thus, we must now look at the five factors listed above to determine whether Tennessee is a "seriously inconvenient" forum in this case.

As to the first factor, the parties here are business entities and businesspersons. Thus, this factor demonstrates that Tennessee is not a "seriously inconvenient" forum. <u>See, e.g.,</u> <u>Madasu v. Berry Co.</u>, 950 So. 2d 333, 338 (Ala. Civ. App. 2006)(holding that the fact that the parties were business entities was one of the factors that "clearly weighed in favor of enforcing the outbound forum-selection clause"). Second, the subject matter of the waste-services agreement appears to have no relevance to the issue whether Tennessee is an inconvenient forum. Third, the forum chosen by the parties for this action--Tennessee--is the business headquarters for International Paper. That fact would present a geographical advantage, at least, for IPC, and this Court has repeatedly

13

1180144

upheld outbound forum-selection clauses where the chosen forum is the state in which a party is headquartered or has its principal place of business. See, e.g., Ex parte United Propane Gas, Inc., 258 So. 3d 1103 (Ala. 2018) (enforcing an outbound forum-selection clause where the forum is the state in which the defendant's headquarters were located), and Ex parte Nawas, 68 So. 3d at 825 (enforcing an outbound forum-selection clause in which the forum is the state of the defendant's principal place of business). As to the fourth factor, the third-party plaintiffs do not indicate that they were unable to understand the terms of the agreement, and the outbound forum-selection clause is clearly and unambiguously written. Finally, as to the fifth factor, although the third-party plaintiffs allege that extraordinary circumstances have arisen since they entered into the waste-services agreement that would make the chosen forum seriously inconvenient--i.e., that International Paper's alleged actions have forced them into bankruptcy--this is only one of several factors to consider. Based on our discussion of the other factors above, which either weigh in favor of the agreed-upon forum or provide no support either way, the facts do not demonstrate

1180144

that enforcing the outbound forum-selection clause would be "unreasonable" on the basis that the contractually agreed-upon forum would be "seriously inconvenient for the trial of the action."

## II.

Next, IPC argues that enforcement of the outbound forum-selection clause will not cause an impermissible "splitting" of claims. Specifically, it argues that the third-party plaintiffs' claims against it should have been filed in a separate lawsuit. According to IPC, the third-party plaintiffs' claims involve circumstances that are separate and distinct from Caterpillar's lawsuit against the third-party plaintiffs. Thus, IPC argues, enforcing the outbound forum-selection clause and requiring the third-party plaintiffs to file their action against it in Tennessee would not be contrary to notions of judicial economy.

This Court has previously recognized that

> "Alabama has a strong policy against splitting causes of action or claims. ... The policy promotes judicial economy, as well as convenience and fairness to the parties. See Century 21 Preferred Props., Inc. v. Alabama Real Estate Comm'n, 401 So. 2d 764, 769 (Ala. 1981) (discussing the rationale for federal pendent jurisdiction). '"'[T]he whole tendency of our decisions is to require a plaintiff

15

1180144

> to try his whole cause of action and his whole case
> at one time.'"' Id. (quoting United Mine Workers of
> America v. Gibbs, 383 U.S. 715, 724, 86 S. Ct. 1130,
> 16 L. Ed. 2d 218 (1966)). 'The prohibition against
> splitting a cause of action is for the purpose of
> avoiding vexatious litigation and a multiplicity of
> lawsuits.' Terrell v. City of Bessemer, 406 So. 2d
> 337, 339 (Ala. 1981)."

Ex parte Leasecomm Corp., 886 So. 2d 58, 63-64 (Ala. 2003).

This Court has applied this rationale in the context of the enforcement of outbound forum-selection clauses. In F.L. Crane & Sons, Inc. v. Malouf Construction Corp., 953 So. 2d 366 (Ala. 2006), Malouf Construction Corporation ("Malouf"), a Mississippi corporation, entered into a contract with Palm Beach Condominiums, LLC ("Palm Beach"), for the construction of condominiums in Orange Beach. Malouf then entered into a subcontract with F.L. Crane & Sons, Inc. ("Crane"), in which Crane agreed to perform some of the work. After the condominiums were built, Palm Beach Owner's Association, Inc. ("the Association"), whose membership consisted of the owners of the units in the condominiums, sued Malouf and Palm Beach in the Baldwin Circuit Court, alleging defects in the construction.

Malouf filed a third-party complaint against Crane and several other subcontractors alleging breach of contract,

16

1180144

breach of warranty, and negligent performance. Crane argued that an outbound forum-selection clause in the subcontract between it and Malouf required the claims to be litigated in a state court in Madison County, Mississippi, or in the United States District Court for the Southern District of Mississippi.

In affirming the trial court's decision denying the enforcement of the outbound forum-selection clause, this Court stated:

"Forum-selection clauses are enforceable under Alabama law. Ex parte Rymer, 860 So. 2d 339, 341 (Ala. 2003). However, this Court has held that a forum-selection clause should not be enforced if the chosen forum would be '"seriously inconvenient for the trial of the action."' Ex parte Leasecomm Corp., 886 So. 2d 58, 62 (Ala. 2003) (quoting Ex parte CTB, Inc., 782 So. 2d [188,] 191 [(Ala. 2000)]). Such a 'serious inconvenience' arises if enforcement of the forum-selection clause '"would result in two lawsuits involving similar claims or issues being tried in separate courts."' 886 So. 2d at 63 (quoting Alpha Sys. Integration, Inc. v. Silicon Graphics, Inc., 646 N.W.2d 904, 909 (Minn. Ct. App. 2002)) (emphasis omitted). Malouf argues that just such a serious inconvenience would exist in this case if we ordered the trial court to enforce the outbound forum-selection clause. In the underlying action, the Association has asserted claims against Malouf arising from Malouf's general construction of the Palm Beach Condominiums; Malouf has, in turn, brought third-party claims against Crane and several other subcontractors. Malouf argues that enforcement of the outbound forum-selection clause in this case

17

1180144

>would move the litigation of the claims between
>Malouf and Crane to Mississippi, where, Malouf
>argues, they would be litigating claims and issues
>identical to those being tried in Alabama between
>Malouf and the Association and between Malouf and
>the other subcontractors, all of which arose out of
>the same construction job as did Malouf's claims
>against Crane. If its claims against Crane are
>transferred, Malouf argues, it would be subject to
>duplicative discovery and litigation.
>
>"Crane asks us to transfer the claims involving
>Malouf and Crane to Mississippi, while all the other
>related claims remain in Alabama. Crane argues that
>the action brought in Alabama by the Association
>involves claims and parties 'wholly unrelated to
>anything Crane did in the construction of Palm Beach
>Condominiums,' and that the action in Mississippi
>would involve the 'sole issue' whether Crane
>properly completed its work during the construction.
>Crane is correct that the action brought by the
>Association involves other parties unrelated to
>Malouf's third-party action against Crane and
>therefore involves issues that may not be present in
>the third-party action, but the opposite is not
>necessarily true. Malouf's claims against Crane
>involve issues that will be litigated in the
>Association's action. Both cases will likely involve
>interpretation of the same contract terms, and
>Malouf's testimony as to its activities during
>construction will be necessary in both actions.
>Litigation of the same issues, arising out of the
>same construction project, could therefore cause
>Malouf 'serious inconvenience.'"

953 So. 2d at 373-74 (emphasis added). Crane illustrates that

enforcement of an outbound forum-selection clause might not

be permitted where the same or similar issues or claims will

be litigated in both the original action and the third-party

18

1180144

action, which arose out of the same subject matter, thereby resulting in an unnecessary "splitting" of the claims and "duplicative" discovery and litigation if the clause is enforced.

That is not the case here. Unlike the claims in <u>Crane</u>, the third-party plaintiffs' claims against IPC are distinct from the claims alleged against them by Caterpillar in its lawsuit. Caterpillar's action involved the breach of loan agreements with JRD and Dailey that were entered into in 2015. In contrast, the third-party plaintiffs allege claims against IPC for circumstances related to the waste-services agreement between International Paper and JRD C&L, an entirely separate, unrelated contract and cause of action.

Additionally, IPC also argues that it is being improperly sued as a third-party defendant in the present case. Rule 14, Ala. R. Civ. P., governs third-party practice and states, in pertinent part:

> "At any time after commencement of the action a defending party, as a third-party plaintiff, <u>may cause a summons and complaint to be served upon a person</u> not a party to the action <u>who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff</u>."

19

1180144

(Emphasis added.) The third-party plaintiffs' claims against IPC are not dependent on the outcome of Caterpillar's claims against them or vice versa, because each lawsuit involves a separate cause of action; nothing establishes that IPC would or may be liable to the third-party plaintiffs for Caterpillar's claims.

Nothing in the materials before us demonstrates that any issues litigated in the third-party action will also be litigated in the Caterpillar case. There is no identity of claims or underlying subject matter; there will be no duplicative discovery or litigation. Under these circumstances, enforcing the outbound forum-selection clause will not result in the "splitting" of an action so as to offend judicial economy.

### III.

Next, IPC argues that International Paper's employees--Janet Pridgeon, Joni Harris, and Shawn Blenis--can enforce the forum-selection clause against the third-party plaintiffs even though they were nonsignatories to the waste-services agreement. IPC also argues that the outbound forum-selection

1180144

clause is enforceable against JRD and Dailey even though they were also nonsignatories to the agreement.

In Ex parte Killian Construction Co., [Ms. 1170696, Nov. 2, 2018] ____ So. 3d ____ (Ala. 2018), the City of Foley contracted with Killian Construction Company ("Killian") to build the Foley Sports Tourism Complex ("the sports complex"). Killian's principal place of business was located in Springfield, Missouri. Killian entered into a subcontract for part of the work with Edward E. Woerner, a resident of Baldwin County, who owned Southern Turf Nurseries, Inc.

According to Woerner, Killian subsequently failed to pay him the full amount due for the work he performed. Woerner sued Killian and one of Killian's employees, Christian Mills, in the Baldwin Circuit Court. Killian and Mills filed a "Notice of Removal" in the United States District Court for the Southern District of Alabama and a "Notice of Removal of Action to Federal Court" in the Baldwin Circuit Court, notifying it that the action had been removed. In their notice of removal, Killian and Mills stated that Woerner "'filed [his] Complaint in [the] Circuit Court of Baldwin County, Alabama, despite [his] agreement to litigate any dispute

1180144

arising under or related to the Subcontract in Missouri
pursuant to a mandatory forum selection clause.'" ____ So. 3d
at ____.

The federal court remanded the case to the Baldwin
Circuit Court. Killian and Mills then moved to dismiss the
circuit court action without prejudice "'pursuant to the
mandatory forum selection clause stipulated to in the parties'
Subcontract Agreement ("the Subcontract"),'" ____ So. 3d at
____, arguing that the clause made Missouri the proper forum.
They further argued that the outbound forum-selection clause
was valid and applicable to all claims because (1) the claims
were all related to the subcontract and (2) Mills, as a
Killian employee, was entitled to enforce the forum-selection
clause because of his relationship to Killian. The circuit
court denied the motion, and Killian and Mills sought mandamus
review.

This Court addressed, among other things, whether Mills,
a nonsignatory to the contract, could enforce the outbound
forum-selection clause:

> "As to the issue whether Mills can enforce the
> outbound forum-selection clause, the complaint
> describes Mills as being 'employed by Defendant
> Killian' and, 'at all times pertinent hereto, ...

22

1180144

Defendant Killian's representative in dealings with [Woerner].' Moreover, in Count II of the complaint, Woerner seeks to hold both Killian and Mills liable for Mills's allegedly fraudulent representations to Woerner. Thus, on the facts as alleged by Woerner, Mills was Killian's employee and agent, and Woerner is attempting to hold Killian liable for Mills's actions as its employee. In <u>Ex parte Procom Services, Inc.</u>, 884 So. 2d 827 (Ala. 2003), this Court considered an analogous set of facts and addressed whether such nonsignatories may enforce a forum-selection clause.

"'Leitch and Crews state in the petition for a writ of mandamus that they "are both entitled to have the outbound forum-selection clause applied to Smith's claims asserted against them" even though they were not signatories to Smith's employment agreement with Procom. ... [F]ederal courts have held that forum-selection clauses <u>bind nonsignatories that are closely related to the contractual relationship or who are "transaction participants</u>." ...

"'We also note an analogy between this Court's enforcement of arbitration clauses as to nonsignatories to a contract and the enforcement of the forum-selection clause in this instance. This Court has stated that "[i]f a nonsignatory's claims are <u>'intertwined with' and 'related to' the contract, arbitration can be enforced.</u>" <u>Cook's Pest Control, Inc. v. Boykin</u>, 807 So. 2d 524, 527 (Ala. 2001); <u>see also Stevens v. Phillips</u>, 852 So. 2d 123, 130 (Ala. 2002), quoting <u>Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 7 F.3d 1110, 1121 (3d Cir. 1993) ("'"Because a principal is bound under the terms of a valid arbitration clause, its agents,

23

1180144

> employees, and representatives are also
> covered under the terms of such
> agreements."'"), and Ex parte Gray, 686 So.
> 2d 250, 251 (Ala. 1996) ("A party should
> not be able to avoid an arbitration
> agreement merely by suing an employee of a
> principal."). Because Smith's claims
> against Leitch and Crews arise out of
> statements Leitch and Crews allegedly made
> while negotiating Smith's employment
> contract with Procom, we conclude that
> Leitch and Crews are entitled to enforce
> the outbound forum-selection clause
> contained in the employment contract.'

"884 So. 2d at 834 (emphasis added).

> "As an employee of Killian and its agent for the
> sports-complex project, Mills is clearly 'closely
> related' to the subcontract. Furthermore, the claims
> against Mills are 'related to' and 'intertwined
> with' the subcontract. The claims against Mills
> concern additional work Woerner performed at the
> sports complex allegedly for Killian at Mills's
> request. Based on Woerner's allegations, the fact
> that the additional work was not included in the
> original work to be performed under the subcontract
> does not preclude Mills from enforcing the outbound
> forum-selection clause. The outbound forum-selection
> clause expressly states that '[a]ny dispute arising
> under or related to this Subcontract Agreement, the
> performance of work or provision of any materials
> pursuant hereto, shall be brought only in state
> court in Greene County, State of Missouri.'
> (Emphasis added.) This Court has held that '[t]he
> term "arising out of or relating to" has a broad
> application.' Unum Life Ins. Co. of America v.
> Wright, 897 So. 2d 1059, 1086 (Ala. 2004). The
> claims against Mills as presented by Woerner arise
> under or relate to the subcontract, and,
> accordingly, Mills can enforce the outbound
> forum-selection clause."

1180144

<u>Id.</u> at _____.

The third-party plaintiffs' complaint in this case describes Pridgeon, Blenis, and Harris as employees of International Paper and refers to them as International Paper's "representatives." In Count III of the complaint, the third-party plaintiffs seek to hold Pridgeon, Blenis, and Harris liable for the alleged "representations and promises" they made to the third-party plaintiffs regarding the waste-services agreement. In Count IV, the third-party plaintiffs allege that all three of them made fraudulent representations concerning the business relationship between the third-party plaintiffs and International Paper. Based on the facts as alleged by the third-party plaintiffs, Pridgeon, Blenis, and Harris acted as agents of International Paper in discussing and finalizing the waste-services agreement with them. Thus, the third-party plaintiffs are attempting to hold Pridgeon, Blenis, and Harris liable for their actions in participating, as International Paper's employees, in the transaction at issue.

The attachments to the petition demonstrate that all three individual third-party defendants are "closely related"

1180144

to the waste-services agreement. Furthermore, the claims against them are "related to" and "intertwined" with the waste-services agreement because they concern alleged representations made during discussions before the signing of the agreement. Given the above, we conclude that all three employees are entitled to enforce the outbound forum-selection clause contained in the waste-services agreement.

Finally, IPC argues that the outbound forum-selection clause is enforceable against JRD and Dailey even though they are also nonsignatories to the waste-services agreement. This Court has previously stated that "'[a] plaintiff cannot simultaneously claim the benefits of a contract and repudiate its burdens and conditions.'" <u>Custom Performance, Inc. v. Dawson</u>, 57 So. 3d 90, 97 (Ala. 2010)(quoting <u>Southern Energy Homes, Inc. v. Ard</u>, 772 So. 2d 1131, 1134 (Ala. 2000)). Here, JRD and Dailey cannot claim the benefits of the enforcement of the waste-services agreement through their breach-of-contract claim without being subject to its outbound forum-selection clause. Thus, IPC is entitled to enforce its right under that clause against JRD and Dailey.

<u>Conclusion</u>

26

1180144

For the foregoing reasons, we conclude that IPC has shown a clear legal right to the writ of mandamus. The trial court is directed to vacate its November 7, 2018, order and to enter an order dismissing the third-party plaintiffs' action against IPC without prejudice, pursuant to Rule 12(b)(3), Ala. R. Civ. P.

PETITION GRANTED; WRIT ISSUED.

Parker, C.J., and Bolin, Wise, Bryan, Sellers, Mendheim, Stewart, and Mitchell, JJ., concur.

27